145 So. 285

**STATE ex rel. BURLEIGH v. SAVOIE et ux.**

**No. 31256.**

June 20, 1932.

On Rehearing Jan. 3, 1933.

W. C. Perrault, of Opelousas, for appellant.

R. Lee Garland and A. V. Pavy, both of Opelousas, for appellees.

OVERTON, J.

The relator wedded defendant's daughter. The young married couple established their home on defendants' farm, where the two lived until some time in 1930, in which year relator met with the misfortune of losing his wife. A daughter, Gussie Burleigh, was born of this marriage. This suit, which is a proceeding by habeas corpus, concerns the custody of that child. The question present-ed is whether the father of the child, the relator herein, has forfeited his parental right to its custody. The child was between four and five years of age when the writ was applied for, and about three years of age when its mother died.

Relator is, and at the time of his wife's death was, a tenant farmer. Following his wife's death, relator and his child resided with the child's maternal grandparents, the defendants in this suit, and continued to do so until some time in August, 1930, when relator moved with his child to a neighboring farm, on which his father and mother lived, for the purpose of continuing to do tenant farming; his father being also a tenant farmer. When defendants learned of relator's intention, they protested against his taking the child with him; Mrs. Savoie insisting that her deceased daughter, during her last illness, had promised to give her the child to rear. About the time relator was ready to depart for his neighboring home, the child was sent by Mrs. Savoie to the home of Mrs. Moise Smith, a daughter of Mrs. Savoie, for the purpose of enabling Mrs. Smith to do some sewing for it.

During the absence of the child, relator expressed loneliness for it, and protested against its being taken away for several days at the time. The child was returned to the Savoie home. Upon its return, a fight ensued (probably occasioned by defendant's attempt to take the child to his new home) between relator and his father on one side and Savoie and one or two of his sons on the other side. Relator was overpowered. The child was taken away from him and carried into the Savoie home.

The trouble that had ensued came to the attention of the sheriff, and, through him, to the district judge. The sheriff, accompanied by the judge, the latter going in an effort to restore peace in discharge of his duty as a conservator of the peace, went to the scene of the difficulty. After looking into the matter, the judge persuaded defendants to return the child to relator, upon the ground that it was relator's child. Thereafter, during a period of three or four months, Savoie and Smith went to relator's new home, from time to time, to get the child for a day's visit to its maternal grandmother, and each time they went relator permitted the child to go. This is established by the evidence of both defendants.

The last time the child was sent for was on December 31, 1930. Upon this occasion it went for a day's visit. That evening, Smith, who seems to have been quite active in the matter, returned to relator's home, but without the child. He informed relator, according to the latter's version, that the child would not be returned, and, according to the version of defendants' witnesses, that it would not be returned for a week. Mrs. Savoie says that she sent for the child on that day and that, when night was approaching, she sent Smith and another to relator's home to inform relator that the child would not be returned for a week, as she desired to prepare it for the winter by purchasing clothes for it, and that, as a result of her message, relator ejected Smith from his home.

Although defendants were aware of the fact that the retention of the child by them was displeasing to relator, they took no steps to return the child, and, on January 5, 1931, the sixth day after it had left relator's home, this writ of habeas corpus was sued out by relator.

Counsel for relator has fully and tersely stated the grounds on which defendants, in their pleadings, urge that relator should not be permitted to have the custody of his child. They are, to state them substantially:

(1) Because relator violated the state and federal prohibition laws.

(2) Because he is young, inexperienced, unsettled, attends dances, drinks, peddles whisky, and misbehaves at such dances.

(3) Because he has never qualified as tutor to his child.

(4) Because relator's parents, in whose home he proposes to live with the child, are poor; their house overcrowded and infested with vermin.

(5) Because during the four months in which relator lived with the child with his parents he neglected the child, and that, when the child went to defendants' home on December 31, 1930, it arrived in rags and tatters.

For convenience sake the first and second grounds will be considered last. Taking up therefore the third ground. which is not pressed in the brief of defendants nor referred to in the opinion of the lower court, it suffices to point out that the record fails to disclose that there was any occasion for the father to qualify as natural tutor of his child. The evidence fails to show that the child had any property or rights to be protected or administered. We are not to be

understood as holding that, if it appeared that the child did have property to be administered, and' relator had failed to qualify as natural tutor, the proper remedy would have been to take the child away from him.

■ As to the fourth ground, this is partially relied upon by defendants and is also mentioned by the lower court in its opinion. It is conceded by relator, and substantiated by the evidence, that the home of defendants, which they own, is more pretentious than that of relator's parents, which they do not own. There are ten persons in the home of relator's parents, when the child is not there. They are his father and mother and eight children, some of whom are grown and others are virtually grown, while two of them are still children; one a boy eleven years of age, and the other a girl thirteen years old. All of the children, who are of sufficient age, work with or assist their father upon the farm. There are five beds in the house. When the child is there it sleeps with its aunt or with its father.

As to the house of relator's parents being infested with vermin, or to be more specific, with bed bugs, the evidence is not such as to cause us to affirm, without hesitancy, the correctness of this contention. Those who testify to their presence there are connected with the two families. They made no mention of these insects being there until after this suit had arisen, even to members of the family, save in one instance, where two of the witnesses, or, at least, one of them, thought an explanation, of an unexpected circumstance, was necessary, preferring not to furnish grounds for a scandal, even within the two families, although once there was occasion to mention their presence to defendants and to relator in the interest of the child.

Granting, however, that these insects were present on the occasions testified concerning, the evidence does not warrant the inference that they were there for any continued length of time, the evidence of only one witness, a niece, being to the effect that they were. It is possible for these insects to make their appearance in any home, no matter how well kept, and they may remain for a while before their presence is detected. The record does not justify the conclusion, whatever effect it may have on the result, that the house is usually untidily or negligently kept. In fact, the evidence of two neighbors is to the effect that it was well kept and tends strongly to negative the presence of filthy insects in the house.

■ As to the fifth ground, touching relator's failure to provide suitable clothing for the child during its four months' stay at relator's home with his father, in our view, the evidence before us does not substantiate the charge. The evidence shows that the relator makes sufficient as a tenant farmer to provide the ordinary comforts of life for himself and his child, and to do so as well as the better class of tenant farmers are able to do, and we think the evidence shows a disposition on his part to do so. The evidence shows that on December 31, 1930, the day that the child was taken to its maternal grandmother's and not returned, it had on stockings, shoes, underwear, an additional flannelette undergarment, a dress, and a sweater.

In one of the articles of underwear there were three inconsequential holes and one slit about four or five inches long, but it was not in such condition that a child could not wear it at home. The dress, which was apparently an ordinary cotton dress, had no holes in it. The sweater that the child wore had in it a few inconsequential holes and a slit about two inches long. So far as appears, the remaining clothes that the child wore were in good condition, as well as the shoes and the hat she wore. On another occasion, in the preceding September, one of defendants' witnesses says that she had occasion to visit the home of relator's father, and there saw the child. She says that on that occasion the child's hair was uncombed, her clothes were dirty, her dress was torn on the side, and that she was not in as good a condition as she was at defendants' home. This is a substantial summary of the evidence produced on this phase of the case, save, perhaps, of a vague expression here and there in the record, too vague to be entitled to weight, and save the opinion of two neighbors, who saw the child on the last occasion she left her father's, and who say that she was sufficiently clad for that December day, and was clad much the same as their own child. There is, however, a statement in the opinion of the trial judge, not appearing in the evidence, that, on one occasion, when he saw the child at the home of relator's father, she was in rags. There is no evidence indicating that the child suffered from the cold, or that she was other than healthy, or how she was usually clad.

As to the first and second grounds urged as reasons why relator should not have the custody of his child, it is not questioned by him in the main, in this proceeding, that, in the late summer and early autumn of 1930, he sold whisky, in violation of the prohibition laws, state and federal, at dances, in two neighboring parishes, and occasionally in his own settlement of Coulee Croche—once, it is testified to, in the public road, in front of his home, but there is no evidence that he sold whisky from his home. We judge from the record that sales of whisky in that community are not uncommon, and are not ordinarily viewed with the seriousness that they might be. As to his misbehavior in other respects, it appears that, on one occasion, at a dance, while drinking, though it does not appear that he was addicted to drink, he danced in a disorderly manner, and, as a result, was excluded from the dance hall by the manager. It seems, however, that he was permitted to visit the hall thereafter, and gave no offense.

From the foregoing, it would seem obvious that the third ground urged for depriving relator of his child, touching his failure to qualify as tutor, does not warrant, or even tend to warrant, any such action. The fourth ground, touching the poverty of relator and his parents, the crowded condition of their home, and the presence of vermin therein, likewise ought not to be sustained under the evidence before us. The house, as appears from what we have said, while crowded, does not appear to be so crowded as to be uncomfortable to any marked extent, and this is plainly so as relates to the child, who, while there, sleeps with her father or her aunt. As to the presence of insects in the home, we hesitate to affirm that such was the case, but granting that they were, the evidence, carefully weighed, does not warrant the in-

ference that they were present as a rule, and would not warrant the depriving of the father of his child. That relator and his parents are poor, is, of course, no reason to deprive a parent of his child, nor does the manner in which the child was clad at its home upon the farm on the three occasions mentioned above (including the statement of the judge, not derived from the evidence adduced, as to how the child was clad on one occasion, without inquiring into the regularity of that statement) warrant such action. The child seems to have been comfortably dressed on those occasions, and as to how it was dressed on others does not appear.

In State ex rel. Martin v. Talbot, 161 La. 192, 108 So. 411, 413, citing Act No. 79 of 1894, it was held that:

"The courts are not authorized to interfere with a parent's authority over his or her child except in cases where the physical or moral welfare of the child is endangered by neglect or abuse or vicious or immoral habits on the part of the parent." This principle was quoted approvingly in State ex rel. Bethany v. Corley, 172 La. 266, 134 So. 87.

In State ex rel. Monroe v. Ford, 164 La. 149, 113 So. 798, 800, it was held that:

"The mere fact that the defendant is better able than the relators to take care of the child in a material way does not warrant the court in refusing to recognize the right of the mother to the custody of her child. * * *"

State ex rel. Harper v. Tebault, 147 La. 889, 86 So. 320, 322, announces substantially the same principle as does the foregoing case. There it was said:

"Mrs. Tebault is affectionately attached to her grandchild, and, because of her financial means and high social standing, is perhaps better able than the child's father is to take care of him. But so long as the child's father is able and willing to take care of him, and is deserving of the trust, his right to the tutorship and possession of his child is absolute."

In ex parte Lincoln, 128 La. 278, 54 So. 818, 819, it was said:

" 'For depriving a father of the tutorship of his children, a strong case should be made out.' In re Alexander, 127 La. 853, 54 So. 125; Ozanne v. Delile, 5 Mart. (N. S.) 21; Segura v. Prados, 2 La. Ann. 751."

In the cited case the father of two little girls had been maintaining illicit relations with a woman. These relations were thought by the majority of the court no longer to exist, but the majority said, assuming that they did, "the fact of his maintaining some illicit relations with this woman, she living in Chicago and he in New Orleans, would not be good grounds for depriving him of the care and custody of his children, when there can be no doubt that he is to keep the children at his home in New Orleans in the care of his mother. * * *"

Our conclusion is that defendants' case has failed as to the last three grounds urged against relator's right to resume the care and custody of his child, under the facts disclosed by the record and the law applicable thereto.

This conclusion brings us to the second ground. That ground, we think, may be briefly disposed of, save so far as it is included in the first. Relator is not addicted to drink. The fact that on one occasion,

which happens to have been on a New Year's Eve, while drinking, because of his disorderly dancing, he was excluded from a public dance hall by the manager, does not warrant depriving him, under the authorities cited, of the care and custody of his child.

■ We now reach the sale of whisky, included in both the first and second grounds, as a reason for depriving him of his child's custody. The sale of whisky, meaning, of course, its illicit sale, is wrong. It is contrary to the laws of both the state and nation, and it is always wrong to violate such laws or any others. But the sale of whisky is wrong simply because it is prohibited. Were it not for the statutes prohibiting its sale, the sale of it would not be wrong. Its sale, though unlawful, is not considered as involving moral turpitude. Thus, in Fort v. City of Brinkley, 87 Ark. 400, 112 S. W. 1084, 1085, quoting from Black on Intoxicating Liquors, § 383, it was said:

"Offenses against the liquor laws, such as illegal sales of intoxicants, keeping liquor in possession with the intent to dispose of it unlawfully, illegally transporting liquor from place to place, and the like, are statutory crimes, not being punishable at common law. They are also of the description mala prohibita, as there is no inherent immorality in such acts, and their illegality lies only in the fact of their being positively prohibited."

■ It was never the intention of the Legislature, in our opinion, to make the violation of laws, which violation is not evil in itself, but is evil simply because the act is prohibited, ground for destituting a parent of the custody of his or her child. Such acts, of themselves, though wrong, do not seriously involve the physical and moral welfare of the child. There must be something in addition, and in connection with them, which is not here, to accomplish that. Doubtless, many a "bootlegger," and none of them are to be upheld as model citizens, properly rears and provides for his children. Moreover, not only does it not appear that the "bootlegging proclivities" of relator, which showed themselves for a period of some three months, continue, but we would not greatly change matters by awarding defendants the care and custody of the child. It is true that defendants are not in sympathy wth the illicit sale of liquor, but for that matter neither are relator's parents, who intend assisting in rearing the child, and at whose home it is intended that the child will live. However, the record discloses that one of defendants' sons-in-law, who quite frequently visits his father-in-law and at whose home the child visits when she is at defendants' home, also in the recent past, has sold whisky illicitly.

The case of State ex rel. Peter v. Stanga, 161 La. 978, 109 So. 783, relied on by defendants, is, in its controlling feature, not pertinent here. There the child, who was seven years of age, had been reared from birth by its maternal grandparents. The child, a little girl, knew no mother other than her grandmother. In view of this circumstance, the court awarded the custody of the child to the grandparents rather than to the father, who had married again and was the father of another child, considering that it would work against the welfare of the child to take it away from the only home and the only mother it ever knew. Here the child has lived in the same house with its father virtually all of its life.

The case of Davis v. Willis, 109 La. 13, 124 So. 129, also relied on by defendants, is, like the foregoing case, not applicable here. There a state of facts appeared which, if the child were awarded to the father, showed that the child's moral and physical welfare might be seriously endangered, due to the father's addiction to drink, which likely made the tenure of the position, as barber, given him by his brother, of uncertain duration, and which, upon the loss of that position, would probably force the father, a widower, with his child, from place to place, in an effort, against odds, to obtain employment, and the court therefore refused to restore the custody of the child to her father.

The case of State ex rel. Stockstill v. Spiers, 170 La. 454, 128 So. 275, also cited by defendants, is not pertinent here. The court, after having found that the father tried to induce his wife to get rid of his unborn child, and in view of the remaining facts found, could not award the custody of the child to its father consistently with law. The case, when considered in connection with the facts, is materially different from the one before us.

■ Our conclusion is that the record before us does not disclose a case where the care and custody of the child should be taken away from her father. Relator is able, with the assistance of his mother, who is in good health, and who is willing to assist, to rear the child. It is true that relator is illiterate. So was his wife, and so are the defendants. However, relator promises, under oath, to send the child to school, when it reaches the required age. Relator also promises, under oath, to see that the child receives religious training and attends church. His parents join in these promises. Relator is attached to his child.

The judgment appealed from, which was in favor of defendants, is set aside, and the child is ordered to be surrendered to its father, the relator herein; defendants to have the privilege of visiting the child, and relator to permit the child to visit defendants occasionally.

LAND and ROGERS, JJ., dissent.

ODOM, J., dissents and hands down reasons.

ODOM, J. (dissenting).

I respectfully dissent from the majority opinion and the decree. I am not unmindful of a parent's natural and legal right to have the care and custody of his own child. But that right is not absolute. It is conditional. No parent has the right to retain the custody of his child if by the exercise of that right its physical or moral welfare is jeopardized. The Legislature has so declared, and this court has so held over and over again.

Act No. 79 of 1894, p. 91, § 1, provides that: "Whenever an affidavit shall be made before any district judge that the physical or moral welfare of any child in the State is seriously endangered by the neglect, or abuse, or the vicious, *or immoral habits, or associations, of its parents*, * * * tutor, or other person having the custody of such child * * * it shall be the *duty of such district judge to* summon witnesses, as to the facts set forth in such affidavit * * * and if the proofs be sufficient to establish the facts set forth in such affidavit, it shall be the duty of such judge to cause such child to be removed from

the custody of such parents or parent." (Italics ours.)

In State ex rel. Martin v. Talbot, 161 La. 192, 108 So. 411, 413, this court said:

"The courts are not authorized to interfere with a parent's authority over his or her child *except in cases* where the physical or moral welfare of the child is endangered by neglect or abuse or vicious or immoral habits on the part of the parent."

The court reiterated this principle in the very recent case of State ex rel. Bethany v. Corley, 172 La. 266, 134 So. 87.

The trial judge, who has been on the district bench for many years, and who, no doubt, knows these people as well, if not better, than any one else, took occasion to make two visits to their homes prior to the institution of this suit. Not only that, he saw the witnesses and heard them. He, of all people, knows the conditions and what is best for the child. Here is what he says:

"The relator has convinced the Court from his actions and his conduct, that he is not so much attached to the child as he is actuated by a desire to take the child away from its grandparents because of pique and a desire to injure them; he well knows the attachment that the grandmother has for the child and though he was at the home of his parents with the child, only a stone's throw from that of respondents, he permitted four months to pass without a single visit by the little child to its grandparents.

"In the opinion of the Court he is not entitled to the care and custody of his child; his conduct is notoriously bad and this conduct has developed since he left the home of the respondents; he has become a well-known bootlegger since August, 1930, and, during last Fall liquor was being sold by him at the home of his father, where he proposes that the little child shall have its residence. The paternal grandparents' home is not to be compared to that of the respondent and in fact, the little child, on the occasion that the Court visited the home of Ignace Burleigh, was in an ill kept condition and in tatters and rags. Witnesses have testified on the trial that the home of relator's parents is infested with chinch bugs; whiskey is now being sold from this home; the relator is young, inexperienced and his conduct has not been of the best. He has no home, is unsettled in his habits and proposes to have his father and mother rear the child. The father himself, (meaning the relator's father) on the witness stand testified that he had two children of educable age who had never gone to school and that he was not in favor of education and could make better use of his children in the field; he frankly admitted that two high schools were in the neighborhood of his residence and that school transfer buses passed very near his house."

According to what the trial judge says, this child, a girl, if allowed to remain in the care and custody of its father, will be reared by a "well-known bootlegger" in a house used as a blind tiger. The majority opinion concedes that relator is a bootlegger. But it is held that, even though this be true, that is no reason for depriving this father of the custody of his female child of tender years.

I cannot subscribe to such holding. The sale of intoxicating liquors is outlawed by both federal and state laws. The father of

this child is therefore a lawbreaker; a criminal. His conduct is in open defiance of law and constituted authority. His habitual violation of these penal statutes can be construed in no light other than as rebellion against rule, law, and authority. He has no respect for the laws of his country, and is therefore not a good citizen. It is stated in the majority opinion that the sale of intoxicating liquors "is contrary to the laws of both state and nation and it is always wrong to violate such laws or any others. * * * .Its sale, though unlawful, is not considered as involving moral turpitude."

This holding is wholly contrary to my idea of morals and morality. I think bootlegging is grossly immoral for various reasons, only one of which need be. here stated. A bootlegger is a lawbreaker, and I cannot bring myself to the belief that one who habitually breaks the laws of this country is moral.

But let us lay aside the question whether relator is moral. He is concededly a lawbreaker, and he breaks the law, according to what the trial judge says, in the house where he proposes to carry and rear his child. If he conducts himself in the future as he has in the past he will break the law in the very presence of the child. That, to my mind, is the worst feature of this case. I can conceive that a parent's immorality, bad conduct, or propensity to break the laws might not endanger the moral welfare of the child, because, if a child knows nothing of its parents' bad traits, it will not be influenced by the lives they lead. A child naturally thinks that there is no harm, no wrong, in what its parents do. Children are imitators. When they come into the world they know nothing.

They must follow and learn from some one. Naturally they follow and learn from those they love. Relator says his child loves him. That is natural, and therefore it will be influenced by him; by his conduct.

Then what are the prospects; what is the outlook for this child? What chance has it to develop into an upright, law-abiding citizen under the environment which we know exists in the place where relator proposes to rear it? None in the world! It must come up with and under a father who has no respect for the law, none for himself, nor for others.

On one occasion we know of, he was thrown out of a dance hall because he was drunk. So he not only sells liquor, but drinks it also, at least on occasions. He probably sees no harm in all this; but therein lies the danger. His child will in all probability think as he does.

Aside from all this, there is the question of education. Relator can neither read nor write, and two other members of his family are in the same sad plight, although the three were reared almost within the shadow of public school buildings. These people don't believe in education; they don't want it. Relator's father says he thinks the place for a child is in the field, and this child is to be kept in his house. He says he will see that it goes to school if its father wants it to go. Judging by their present and past conduct, I don't believe either will want it to go. It will certainly not be encouraged to go.

Relator is young, irresponsible, and has no home of his own. He proposes to carry the child to his father's. The trial judge says

he visited there and saw the child in tatters and rags. All the witnesses say the child was rather poorly clad and that the house was infested with bedbugs. I see no reason to believe that these were there by chance. They were seen crawling on the furniture and on the clothing of the inmates in the daytime.

All in all, I think this house is a bad place to raise a child. I think the child's environment, the vicious and immoral habits of its parent, is such as to seriously endanger its welfare, and that the father has forfeited his natural and legal right to its custody.

The other side of the case is that the child's maternal grandmother wants it. She raised it from infancy on the bottle. Due to illness, its mother could never nourish or care for it. She knew what was best for her child, and requested her mother to raise it. She probably knew what the trial judge suspects; that its father cared but little for it.

This grandmother has no small children of her own. She loves the child and wants it. She demonstrated her devotion by properly caring for it. While she had the child, it was properly nourished, healthy, well clothed, and always neat. The testimony warrants the statement that her home ranks above that to which relator proposes to carry it. I think under the law she should have it.

In matters of this kind I think the welfare of a child is paramount to the parent's natural and legal right of custody. Children are not chattels. They are citizens in the making; wards of the state. The moment a parent so conducts himself as to endanger his child's moral or physical welfare, that moment he forfeits his right to its custody

and the state takes charge. Undoubtedly this is a case where the state should protect its ward.

## On Rehearing.

ST. PAUL, J.

The case is fully stated in the original opinion. Briefly restated, it is a proceeding by habeas corpus in which a widowed father seeks to regain the custody of his five year old daughter from her grandparents, the father and mother of relator's deceased wife.

### I.

Up to the time of the wife's death the young couple had lived at the home of the wife's parents, and there is not even a suggestion that relator was not a good husband and father. His occupation was that of farmer, and he earned his own livelihood, and that of his wife and child, as a tenant farmer on his own father's place in the neighborhood. Again there is no suggestion whatever that he did not provide adequately for their needs; considering that all parties concerned are people in very modest circumstances, though it seems that the wife's parents are slightly better off—or, more correctly speaking, a little less bad off—in this world's goods than relator's own parents.

All parties are, or were, respected by each other and by all their neighbors until this proceeding had to be taken and they began herein to fling at each other mutual charges of *moral turpitude* anent alleged violations of the prohibition laws, state and federal; which violations, the parties confess, had not occurred to them as involving moral turpitude until their eyes were opened to the enormity thereof by the exigencies of this case.

## II.

When the mother died the child was about three years old. The relator continued to reside at the home of his deceased wife's parents, and to work on his father's farm.

Some time afterwards he decided to remove his abode to his own father's home, on whose farm he was working; and, of course, to take his child with him. But the grandmother protested that her deceased daughter had promised on her death-bed to give *her* the child to rear. Well, to make a long story short, there was eventually a pitched battle, as it were, over who should have possession of the child; between the grandmother and the maternal relations on one side, and the father and the paternal relations on the other; which was abated only when the sheriff and district judge unofficially intervened as moderators, with the result that the child was given to her father—and still nothing was said, *up to this time*, about bootlegging and blind tiger.

However, notwithstanding this ominous occurrence, which might have served as a warning to a more cautious man, the father permitted the child to go to her grandparents' home as often as they sent for her. And, again to cut short the story, on the last occasion, after exhausting one pretext and another, the grandparents finally refused flatly to restore the child to her father.

Whereupon, these proceedings were taken.

## III.

As a defense to the proceedings the grandparents have advanced a number of reasons why the father should be denied the custody of his child; reasons for the most part so frivolous that they will not even be mentioned. And now for the first time, post litem motam, it is charged, in effect, that relator is a notorious "boot-legger" and his father's house, where he means to take the child, a "blind-tiger."

Upon *this* subject the organ of the court on the first hearing said, inter alia (three justices concurring and three dissenting):

" * * * It is not questioned by him [the relator] in the main, * * * that, in the late summer and early autumn of 1930, he sold whisky, in violation of the prohibition laws, state and federal, at dances, in two neighboring parishes, and occasionally in his own settlement of Coulee Croche—once, it is testified to, in the public road, in front of his home, *but there is no evidence that he sold whisky from his home.*" (Italics by this writer.)

On the other hand it is said in the opinion of the district judge, quoted extensively in the dissenting opinion on the first hearing, that " * * * He (the relator) has become a well-known boot-legger since August 1930, and during last Fall (1930) liquor was being sold by him at the home of his father, where he proposes that the little child shall have its residence. * * *" And the dissenting opinion then continues: "According to what the trial judge says, this child, a girl, if allowed to remain in the care and custody of its father will be reared by a well-known bootlegger in a house used as blind tiger. The majority opinion concedes that relator is a bootlegger. But it is held that even though this be true, that is no reason for depriving

this father of the custody of his female child of tender years."

## IV.

As to the moral turpitude, vel non, involved in the mere *sale* of whisky in violation of a prohibitory law, *that* was discussed in the original opinion and will not be gone into again. Suffice it here to say that this was not the first time this court had expressed itself on that subject. In Saint v. Irion, 165 La. 1038, 116 So. 549, 553, this court said: "Conviction for violation of the prohibition Law is not such conviction of crime as involves moral turpitude"—citing Bartos v. United States District Court (C. C. A.) 19 F. (2d) 722; Coykendall v. Skrmetta, 22 F.(2d) 120 (C. C. A. Fifth, Oct. 22, 1927); People v. Leslie, 239 Mich. 334, 214 N. W. 128. See, also, Fort v. City of Brinkley, 87 Ark. 400, 112 S. W. 1084, cited in the original opinion.

And (as this writer appreciates it) if that were the only matter involved no rehearing would have been granted.

## V.

But there is a sharp conflict between the trial judge's appreciation of what this record shows anent *sales of liquor from the home of defendant's father*, and that of the justices who subscribed to the majority opinion. And even they are not willing to concede that the surroundings of a blind tiger afford the proper atmosphere for the rearing of a child; not simply because whisky is sold there, but because the quiet, retired blind tigers of bygone days, have developed into the glaring notorious "speakeasies," road houses and night clubs which flourish so plentifully now; and of which no more need be said.

## VI.

The conflict above mentioned must be settled by recourse to the record itself. And here is the whole evidence on the subject.

Gerasin Smith, on direct examination:

"Q. Had you occasion, during the past Fall, up until the first of the year (1931), to go to the house of Ignace Burleigh for any purpose? A. Yes.

"Q. About how many times did you go there? A. Two or three times.

"Q. On those different occasions did you buy whisky from anyone at the time? A. Yes.

"Q. How much whisky did you buy? A. Half a bottle at the time.

"Q. Did you buy whisky on different occasions or upon one occasion? A. On different occasions.

"Q. Was that since Antoine moved from O'Neill Savoie's? A. Yes.

"Q. About how many times do you estimate you bought whisky there since the first of September? A. Two or three times.

"Q. You would buy a half bottle on each occasion? A. Yes.

"Q. How would you buy the whisky, from someone in the house? A. I bought it from Antoine.

"Q. Was it in the house you bought it? A. Sometime it was in the house, sometime it was out doors.

"Q. Would you pay him for the whisky? A. Yes, fifty five cents a half bottle."

Emile Venable, on direct examination:

"Q. Have you ever had occasion to visit the home of either one, Antoine or Ignace Burleigh? A. Yes.

"Q. You have gone there on several occasions? A. No.

"Q. Do you frequent the dances that are given in that neighborhood? A. Yes.

"Q. At what hall? A. Esther Hebert's.

"Q. Did you ever have occasion to meet Antoine Burleigh at the hall? A. Yes, I have met him.

"Q. That is since his wife's death? A. Yes.

"Q. You saw him around there? A. Yes.

"Q. Do you know whether or not he was selling whisky? A. Yes, he was selling and I bought some from him.

"Q. That was while the dance was going on? A. Yes."

On cross-examination:

"Q. You never did buy any whisky from Antoine Burleigh except on that occasion? A. I went to their house on Sunday morning to buy some whisky and they told me they had sold out Saturday night. The stock was gone.

"Q. Isn't it a fact you didn't even get down and go in the house when you went there? A. I didn't go in.

"Q. You never did see any whisky around in that house, did you? A. No.

"Q. And you say he told you he didn't have any whisky? A. He said he was out of whisky.

"Q. Didn't have any? A. No.

"Q. How long ago was that? A. About two or three months ago."

### VII.

This is the whole testimony on which defendants rely to establish that Ignace Burleigh's home, to which relator purposes to take his child, is a blind tiger.

Of course the testimony of Emile Venable does *not* prove that Antoine Burleigh sold whisky from his father's house; for, as we read his evidence, the witness swears that he did *not* buy any whisky there. Even were several hundred other witnesses to swear just as Venable swore, it would still not suffice to prove that even a thimbleful of whisky was sold from Ignace Burleigh's home—or, at least, so it seems to us.

Gerasin Smith swears that he went to the house of Ignace Burleigh "two or three times"; that when he went there he bought whisky from the relator, "sometime it was in the house, sometime it was out doors."

When a witness swears that he did a thing "two or three times," it means that he is morally certain of having done it twice, but not certain that he did it *three times*. If the witness be not morally certain of having done the thing more than twice, it would seem that a court should not feel *legally certain* that he did it more often; for if the witness himself be uncertain, how then can the court itself be certain; and "In dubio, sequendum quod tutius est."

We take it therefore that the testimony of Gerasin Smith, even if taken at par, establishes as *certain* no more than this; that he

bought whisky of Antoine Burleigh twice, "sometime in the house, sometime out doors." But if he bought the whisky only *twice*, of which "sometime" (therefore, at least one time) was "outdoors," it follows necessarily that he bought it "in the house" only once.

Our statement that "there is no evidence that he sold whisky from his house" is therefore too broad; it should be, "there is no evidence that he sold whisky from his house, *except on one occasion.*" And *that,* in our opinion, is not sufficient ground to deprive this father of the custody of his child.

The Legislature has never seen fit to authorize the inflicting of an *infamous punishment* for such an offense, and hence even a conviction for such offense would never afford ground for a divorce. Hull v. Donze, 164 La. 199, 113 So. 816. And if the lawmaker has not thought proper to authorize even the mother herself to displace and supersede the father's paternal authority over the child under such circumstances, it does not belong to the judiciary to do so at the instance of some outsider who conceives the idea that he or she is better qualified to rear the child properly than is the one to whom nature has confided it.

### Decree.

For the reasons assigned, our former decree is now reinstated and made the final judgment of the court.

LAND, ROGERS and ODOM, JJ., dissent.

ROGERS, J. (dissenting).

I think the judgment appealed from should be affirmed. The fact that the relator proposes to place and rear his five year old daughter in the home of his parents where intoxicating liquor is being sold is only one of a number of facts disclosed by the record which, taken as a whole, sustain the correctness of the judgment.