155 So. 435

**STATE ex rel. PITRE v. LEFORT.**

No. 32271.

May 21, 1934.

Harvey Peltier and Hubert A. Lafargue, both of Thibodaux, for appellant.

J. A. O. Coignet and Howell & Deramee, all of Thibodaux, for appellee.

ODOM, Justice.

Relator is the father and respondent the maternal grandfather of Lillian Pitre, a girl now about six years old. The mother of the child is dead. The child was at the time this suit was filed and is now in the custody and care of its grandfather. Relator brought the present suit to have the child delivered into his custody and keeping. The trial judge, after hearing the case, refused relator's demands, ordered that the child be left in the custody and care of its grandfather and relator appealed.

The child involved was conceived out of marriage, the mother, Rose Lefort, being under eighteen years of age at the time of its conception. Relator was prosecuted for the crime of having carnal knowledge of the said Rose Lefort, with her consent, the prosecution being instituted under Act No. 192 of 1912. He was convicted, but not then sentenced. Two days after his conviction he and Rose Lefort were married and the child was born within a month from the date of the marriage.

Relator was set at liberty without sentence and took his wife to the home of his father and mother, where the child was born.

There the couple lived together about two years, or until March 26, 1930, when they separated. Immediately after the separation the mother went to the home of her father three and a half or four miles away, carrying the child with her. There she remained with the child to the date of her death, in November, 1932, relator remaining with his father and mother. After the death of the child's mother, relator demanded that the grandfather deliver the child into his custody. This demand being rejected, the present suit followed in December.

As already stated, the couple separated on March 26, 1930, when the mother went to live with her father, the respondent. In the month of September, after the separation took place in March, relator was called into court and sentenced to serve not less than two nor more than three years at hard labor in the state penitentiary under the conviction for carnal knowledge in March, 1928. Due to several reprieves, he did not begin to serve his term in the penitentiary until June, 1931, and, after serving about three months, he was paroled and returned to his father's home.

For a period of approximately two years after the separation in March, 1930, relator contributed practically nothing toward the support of his wife and child, and on March 1, 1932, the district attorney had criminal proceedings brought against him for his neglect of and failure to support his wife and minor child. He entered a plea of guilty to the charge on March 10, 1932, and the court in lieu of fine or imprisonment ordered that he pay to his wife $2.50 per week for the support of herself and child. He complied reasonably with the court's order, although he was about $20 in arrears at the time of his wife's death in November, 1932.

The testimony shows, in fact, relator admits, that, although he lived within three and a half to four miles from where his wife and child were living, he did not see the child once from the date on which he and his wife separated in March, 1930, to the date on which this case was tried in January, 1933, a period of nearly three years. The child was brought into court along with other children of about the same age and when relator was asked to say which of the children was his, he was unable to do so, saying, "Well, I have not seen her in about two or three years and then she was a little baby and she may have changed." The child, of course, did not recognize its father. The two were strangers to each other.

Relator has no home of his own, but lives in the house of his father and mother, where he proposes to carry the child in case he is successful in this suit. Relator's mother testified that she had never seen the child from the date on which her daughter-in-law took her from her home in March, 1930, up to the time the present suit was tried. She was asked if she had ever made inquiries about the child and its welfare and she said that she had on a few occasions, but that she had never received any information. She was asked if she had ever asked Hypolite Lefort how the child was getting along and she replied, "No, sir, we didn't ask him because it was too hard for us; we couldn't ask him those things." She was then asked, "What was so hard, madam?" and she replied, "It was that they had had my son punished like

that. That was harder than death, for a mother especially."

During the winter season relator and his father follow trapping for a livelihood and in the spring and summer they farm. They do not own the house which they occupy as a home, nor do they own the land they cultivate. During the winter or trapping season, relator and his father spend a portion of the time at a camp on the prairie some fifteen miles away from where they live. Relator's mother spends a considerable portion of her time at the camp with her husband and son and stated that in case the child was sent to her home she would carry it along with her to this camp. The testimony indicates that relator and his parents are able to take care of the child and they all say that they are willing to do so.

Now, as to Mr. Lefort, the respondent. He is in better financial circumstances than the Pitres. He owns a large tract of land, farms, and is a money lender. He says he can live twenty years without work. He retired some time ago. His wife died several years ago. One of his daughters, twenty-five years old, who has two little girls, lives with and keeps house for him. He is amply able to support and care for his grandchild, Lillian Pitre. He is a good man, respected by all who know him. The child has been with him since March, 1930, and he is extremely anxious to keep and rear her. His daughter who lives with him wants the child. She seems to be a good woman and we have no doubt that the child will be well taken care of by her. It is certain that Mr. Lefort, the child's grandfather, loves her, wants her, and will do everything within his power to rear her as she

should be reared, and, as we have said, he is amply able to provide all things necessary for her comfort and happiness.

We are convinced that Mr. Lefort loves this grandchild as devotedly as he ever loved her mother or any of his other children. He has had her with him in his home now for more than four years. His natural, instinctive love for her has become more intense because of his constant care of and association with her. And as to the child, the testimony shows she has been well taken care of and is happy where she is.

The trial judge, who knows all these people, who knows their past records as well as their present situations, who had all of them before him at the trial, thought the child should remain where she is, in the care of and custody of her grandfather, and rendered judgment accordingly. We fully concur in his views and approve his ruling.

▪ Ordinarily, parents have the natural and legal right to the custody and care of their minor children. But their right in this respect is not unquestionable or absolute. State v. Lewis, 145 La. 23, 81 So. 742; State ex rel. Stockstill v. Spiers et ux., 170 La. 454, 128 So. 275.

In State v. Michel, 105 La. 746, 30 So. 122, 124, 54 L. R. A. 927, this court said:

"While the father may have the first title to custody of the children by nature, his claim may be disregarded by the court, acting on a principle of natural justice."

In Ex parte Ryan, 126 La. 449, 52 So. 573, the court said, speaking of the rights of parents:

"It is a matter in which the state has an interest beyond the mere right and authority of the father. The welfare and happiness of the child are involved and have to be considered by the court."

In State ex rel. Peter v. Stanga, 161 La. 978, 109 So. 783, this court said:

"Welfare of child will prevail over technical right of father to possession. * * * The real issue involved, as we view it, is not so much whether the cold technical right of the father to the possession of his child should be maintained, as it is whether, from the standpoint of the welfare of the child, she should be permitted to remain in the care of her grandmother."

The principles and rules announced in the above cases are applicable to this one and are controlling. Counsel for relator cites, in support of their contentions, the recent case of State ex rel. Burleigh v. Savoie et ux., 176 La. 115, 145 So. 285. But the ruling in the Burleigh Case is not against the general principles announced in the other cases cited above.

In the case at bar, we think the father is unworthy. If he has the slightest love or affection for his child, he has never shown it. After he and his wife separated, she was driven to the necessity of returning to her father's home for food, clothing, and shelter, and during the entire period from March, 1930, to January, 1933, he contributed practically nothing to the support of his child except what he was forced to contribute by the court. And worse than that, he seems to have lost all interest in the child. He says he occasionally made inquiries about her, but never at any time did he see her nor ask to see her, although he lived but a few miles from her all the while. There is some enmity between him and his family on the one side and his wife's family on the other, but the wife's father testified that he had never objected to relator's visiting the child nor would he have done so if such request had been made, but none was made. Relator does not say that he ever at any time sought an opportunity to see the child. So that now when he says he loves her, we cannot believe him. His past actions belie his present utterances.

As to relator's character, it needs only to be said that he seduced the child's mother when she was only seventeen years of age, and still in school, for which crime he was prosecuted criminally, convicted, and served a term in prison at hard labor. True, he married the girl, but he did so only after he was convicted and about one month before the child was born. The fact that he was convicted but permitted to go free for a time, and that he lived with her, strongly indicates that his conduct in marrying and living with the child's mother was induced by the hope that by doing so he might escape punishment, and the indications are that if he had continued to live with her, he would have escaped, the fact being that he was not sentenced until after the separation. He seems to have been actuated by selfish motives. Furthermore, he evidently had no love for the woman for he soon separated from her and not until he was forced to do so did he contribute to her support. Relator's mother says that there was never any love between the two.

There is this also which must be considered. Relator is hostile in his feelings toward all his wife's relatives and especially toward respondent. He and his family attribute his prosecution and conviction, which they seem to think was unjust, to their activities. He resents every move they have made and thinks they are responsible for his troubles. He may not consciously visit upon the child the imaginary sins of its maternal relatives and his father and mother may not do so. But being hostile and resentful as they are, it is doubtful if either he or his relatives can ever have that affectionate, warm, and sympathetic feeling for the child that they would have under other circumstances. It would be highly detrimental to the child's welfare and most unfortunate if she found herself in an unfriendly atmosphere in the presence of relator's relatives, and this we fear might be the case. To say the least, relator and his people are total strangers to the child. She has never been with them and knows nothing about them. On the other hand, she is now with the only people she has ever known, the only ones she loves and we think the only ones who love her. She is old enough now to know, to understand, to form attachments, and to remember. To wrest her now from the bosom of her grandfather, who has always loved and cared for her, and whom the child now loves, and to place her in a strange family would be cruel and unjust to the child and contrary to her best interests, to say nothing of the rights and feelings of the grandfather.

The judgment appealed from is affirmed.

BRUNOT, J., dissents.