171 So. 98

STATE ex rel. BURLEIGH v. SAVOIE et al.

No. 33467.

Nov. 4, 1936.

Rehearing Denied Nov. 30, 1936.

W. C. Perrault, of Opelousas, for appellant.

Dubuisson & Dubuisson, of Opelousas, for appellees.

FOURNET, Justice.

This is a proceeding by habeas corpus, instituted by relator against respondents to regain the possession and custody of his eight year old daughter, Gussie Burleigh, from her maternal grandparents, respondents herein. This is the sequel to the case of State ex rel. Burleigh v. Savoie et ux., 176 La. 115, 145 So. 285, 286, involving the custody of the same child and between the same parties.

Relator's petition contains the following allegations: That under judgment of this court, rendered on June 20, 1932, he was awarded the custody of his minor daughter, and respondents were ordered to return the child to him, with the privilege granted to them to visit the child; that on rehearing the judgment was reinstated and became final on January 3, 1933; that in order to have a specific understanding relative to the visits of the child with its grandparents, an agreement was entered

into between relator and respondents, which was incorporated in the judgment of the district court, whereby it was stipulated that the child should be permitted to visit the respondents from the afternoon of the first Friday of each month, after school hours, until the following Monday at the beginning of school hours, and ten days during the summer vacation. The agreement provided further that should illness prevent the child's visit on the day appointed, such visit should be made on the following Friday. It is further alleged in the petition that the first Friday of January, 1935, fell on the 4th, but because of the child's illness on that day, she was delivered to the respondents on the following Friday, January 11th, pursuant to the agreement; that respondents, in violation and in contempt of the authority of the district court and of the Supreme Court, failed and refused to return the child on the following Monday, January 14th, and announced that they intended to keep the child permanently and deprive relator of her custody. Relator also alleged that on a previous occasion, August 11, 1934, his daughter went to respondents' home and when he called there for her, he was not only refused his child, but respondents and their son threatened to beat him with a club if he did not immediately leave their premises, and in order to regain his child without serious difficulty, he had to resort to habeas corpus proceedings, which respondents did not even contest. But on the day following the order of court to return the child, August 21, 1934, respondents instituted a similar proceeding against relator, charging him and his father with various acts of cruelty and neglect of the child, which action the district court dismissed on August 29, 1934. Relator urges that because of the situation that exists he can no longer permit his child to visit respondents for fear that they may continue to deprive him unlawfully of her custody, and he is therefore entitled to her exclusive custody without restrictions, except the right to allow respondents to visit the child at relator's home.

In answer to the rule issued in this case, respondents admitted their failure to return the child on the appointed day, and in justification therefor averred that the child at that time was suffering acutely from her throat and from a severe skin ailment, and that her condition was such that the doctor recommended an early operation to remove the child's tonsils, which they had performed on the 26th of January, 1935, and in reconvention, claimed the permanent custody of the child on the grounds, in substance as follows:

(a) That since the custody of the child was awarded to relator by the Supreme Court, the relator remarried, left the roof of his parents, and has since lived alone with his second wife and the child born of that marriage;

(b) That relator, since his marriage, has relegated his minor child in controversy here almost entirely to his parents' care;

(c) That the home of relator's parents is overcrowded; that they have not the means to care for the child; and that

they do not want the child and abuse and maltreat her;

(d) That Raoul Burleigh, a 15 year old brother of relator and an inmate of the paternal grandparents' home, raped or tried to rape the child about the middle of December, 1934, and that, as a result of said occurrence, the child is still suffering from physical injuries to her genital parts;

(e) That relator cursed and abused his child when she revealed the alleged rape and threatened to kill her if she repeated it to others;

(f) That the child does not want to live with her father or paternal grandparents and prefers to remain with defendants, who want her and are able to take care of her;

(g) That relator, since being awarded the custody of the child, has neglected her physically, mentally, and morally, and cannot and will not care for her.

On the very day that respondents filed their answer and reconventional demand, relator, with leave of the court, filed an amended and supplemental petition, alleging that respondents, in their desperate efforts to gain the custody of the child, had made maliciously false statements and charges against him and his young brother in their reconventional demand, and thereby forfeited any right which they had to enter his home or to have his child visit them, and prayed that he be given the exclusive and permanent custody of his child.

Relator also filed a motion to strike from the answer and reconventional demand those allegations contained in the paragraphs hereinabove set out, lettered (a) to (f), inclusive, on the ground that those matters were concluded by judgments of this court in the case of State ex rel. Burleigh v. Savoie, supra, and of the district court which was rendered on August 29, 1934, and as to the allegations contained in paragraph (g), that they were too vague and indefinite to admit of proof.

The district judge overruled the motion to strike out, and on the trial of the merits, dismissed relator's proceeding and awarded the custody of the child to respondents, but granting relator permission to visit his child at all reasonable times. From that judgment relator has appealed.

A review of the judgment in the case of State ex rel. Burleigh v. Savoie, supra, and the judgment of the district court of August 29, 1934, conclusively show that the averments in the reconventional demand in paragraphs (d) and (e) were not at issue and therefore not adjudicated upon in those cases. Moreover, judgments awarding the custody of minor children are subject to modification at any time. We therefore conclude that the trial judge correctly overruled the motion to strike from the answer and reconventional demand the averments above referred to.

When this case was previously before this court, it was said: "The question presented is *whether the father of the child * * * has forfeited his parental right to its custody.*" (Italics ours.) And in the case of State ex rel. Perdue v.

Carkuff et al., 182 La. 920, 162 So. 729, in which the same question was involved, we quoted approvingly from the case of Ex parte Lincoln, 128 La. 278, 54 So. 818, 819, as follows:

"It is the well-settled jurisprudence of this state that the courts are not authorized. to interfere with a parent's authority over his children, except if 'the court is satisfied that he (or she) will neglect them, or expose them to improper influences, in which case the paramount interest which society has in seeing to it that they be well taken care of and properly brought up would justify the court in making some other disposition of them.' "

It is the contention of respondents that the facts in the case at bar and those in the case of State ex rel. Peter v. Stanga et' ux., 161 La. 978, 109 So. 783, are so nearly identical that that decision should be controlling in the case here, because relator has not only remarried, but has delegated the custody of his child almost exclusively to his parents.

It seems to us that respondents' contention was disposed of in the case of State ex rel. Burleigh v. Savoie, supra, for in that case the court said: "The case of State ex rel. Peter v. Stanga, 161 La. 978, 109 So. 783, relied on by defendants, is, in its controlling feature, not pertinent here. There the child, who was seven years of age, had been reared from birth by its maternal grandparents. The child, a little girl, knew no mother other than her grandmother. In view of this circumstance, the court awarded the custody of the child to the grandparents rather than to the father, who had married again and was the father of another child, considering that it would work against the welfare of the child to take it away from the only home and the only mother it ever knew. Here the child has lived in the same house with its father virtually all of its life." This is particularly true now; because since the rendition of that judgment, the record shows that respondents never had the custody of the child at any time except under the authority of the judgment of the district court of August 29, 1934, or in violation thereof, as is alleged and shown by relator.

In the case of State ex rel. Perdue v. Carkuff et al., supra, we said that "while each case stands on its own merits, we think the rule applied in the case of Heitkamp v. Ragan [142 La. 81, 76 So. 247], is proper and sound," and quoted approvingly therefrom the following, 182 La. 920, at page 922, 162 So. 729:

*"The burden is on those resisting the father to show his disqualification and unfitness to have the care and custody of his children."* (Italics ours.)

And 182 La. 920, at page 923, 162 So. 729, 730, we further quoted, with approval from the Heitkamp case, the following:

"A judge has some discretion over the care and custody of children; but it has to be exercised on solid and substantial grounds. Nor can the fact that other people are attached to the child, or that the child is attached to other people, or that the ability of other people can better provide for the care, etc., of the child

deprive the father of his parental right and authority to have the care and custody of his own child. * * *

"The discretion to be exercised is not an arbitrary one, but in the absence of any positive disqualification of the father for the proper discharge of his parental duties, he has, as it seems to us, a paramount right to the custody of his infant child, which no court is at liberty to disregard. And while we are bound also to regard the permanent interests and welfare of the child, it is to be presumed that its interests and welfare will be best promoted by continuing that guardianship which the law has provided until it is made plainly to appear that the father is no longer worthy of the trust. The breaking of the ties which bind the father and the child can never be justified without the most solid and substantial reasons."

The sole question for our consideration, therefore, is whether respondents, by a fair preponderance of the evidence, have shown that relator has neglected his minor daughter and exposed her to improper influences, as is charged by them, so as to justify depriving him of his parental right to the custody of his child.

Counsel for respondents admit that the evidence is contradictory on the question of whether relator did or did not delegate the custody of his minor daughter exclusively to his parents following his second marriage, and also as to the alleged mistreatment and neglect of the child by relator and his family. But it is their contention that we should invoke the rule that

the trial judge's decision should not be disturbed because he had the opportunity of seeing and hearing the witnesses, and is presumably informed on the conditions existing in the community and therefore in a better position to pass upon the credibility of the witnesses than we are.

The respondents, in their reconventional demand against relator, made serious charges which would render him unfit to have the custody of his eight year old daughter, and they are that " * * * an abominable outrage *has recently been committed* against the child by Raoul Burleigh, a fifteen year old son of Gussie's paternal grandparents and one of the many inmates of their home" (art. 22); "that * * * this outrage occurred *about the middle of December, 1934*, when Raoul raped, or attempted to rape, Gussie, and so violently abused her genital parts as seriously to injure them, *from which injuries the poor, eight* year old child is still shamefully suffering" (art. 23); and that "when relater learned that Gussie had revealed the happening of the said assault upon her person, he cursed her cruelly and threatened to kill her if she mentioned it to anyone else, although the child was still suffering from the effects thereof and in need of sympathetic care and medical attention" (art. 24). (Italics ours.)

The only evidence in the record in support of these charges is the testimony of the child. We therefore have carefully analyzed her testimony in relation to the other evidence in the record, which reveals the facts hereinafter stated.

On direct examination by counsel for respondents the child testified that she was thrown on the floor, at the home of her paternal grandparents, by relator's young brother, Raoul, *who got on top of her and stuck her.* When asked what else he did to her, she answered, "that is all." But upon being asked the following suggestive and leading questions by counsel, she answered as follows:

"Q. Did he raise your clothes? A. Yes.

"Q. And did he undo his clothes? A. Yes.

"Q. Did he make you bleed? A. Yes."

She further testified that she did not remember the exact time of the alleged incident, but subsequently, on cross-examination, stated positively that the incident happened one afternoon upon their return from school in the wintertime, and when asked whether her father found that out, she answered, *"No, he never knew. Mrs. Ignace told me to tell I had gotten hurt falling on a plank."* Again when asked if her father ever talked to her about that, she answered, *"No."* However, following this testimony, while still under direct examination by counsel for respondents, she testified that her father took her to the doctor's office the following day to be examined for the alleged injury, which she told her father she received as a result of a fall on a plank, and although she claimed that her father never knew of the incident, she testified that when they left the doctor's office on their way home, he cursed her and told her that if she ever told "her pepere and nanan"

(respondents herein) about what happened to her on account of Raoul's action, he would kill her. Under cross-examination, however, when asked what he (relator) said, she answered, "that is all he said; *he cursed me.*" She replied, "No" to the question: "You don't know what he told you?"

She also testified that, on her visit to her grandparents, respondents herein, on January 11th, when she found out that they were going to operate on her for tonsilitis, she was suffering so with her genital parts, she decided to tell her maternal grandmother.

It is significant that when asked whether she had ever told any one else, she replied "No," and then when asked the direct and leading question, she admitted having told Mrs. Moise Smith of the incident.

The record discloses that when the child visited her grandparents on January 11th, she was' suffering with a skin ailment and with her tonsils. On the day following, respondents, in company with their daughter, Mrs. Moise Smith, took the child to Opelousas where they consulted with the district judge and the district attorney, upon whose advice they had the child examined by Dr. Masterson, the parish health doctor, and Dr. Guidry, their personal physician, and decided to keep the child, in order to have a tonsilectomy performed. And while the testimony is conflicting as to the exact day the child told her maternal grandmother and aunt of this alleged outrage, nevertheless, neither respondents nor their daughter ever communicated that fact either to relator or to

any one else until they filed their answer and reconventional demand on February 25, 1935.

On the other hand, the record shows that Dr. Guidry testified that he examined the child on two occasions at the request of respondents, before and after the suit was instituted, to determine whether the child had been assaulted as claimed by them, and he positively informed them that the condition, which they believed to be a social disease, was simply an innocent vulva vaginitis; that there was not the slightest evidence of any penetration or injury to the genital parts, and that the ailment from which she was suffering could not have been caused by the alleged assault.

Apparently, respondents were not satisfied with Dr. Guidry's diagnosis, because they consulted two other physicians, a Dr. Arreteig of Church Point, and Dr. Lionel Bienvenu of Opelousas. The latter examined the child several days after Dr. Guidry's examination, and his testimony corroborates that of Dr. Guidry, except that he found a slight rupture of the hymen which he testified is common with young girls and could have been caused by any exercise taken at school, such as jumping, or even riding in an automobile. Dr. Arreteig did not testify. Moreover, both Dr. Guidry and Dr. Bienvenu testified to the effect that if the alleged outrage had been perpetrated, it would have left a scar, and in this case there was not the slightest evidence thereof. It appears to us that if the alleged injury had taken place in December, as alleged in the peti-

tion, or in the wintertime, as testified to by the child, the examinations of three physicians, during the following month, would have revealed some evidence of it.

Besides, relator positively denied any knowledge of the alleged injury until he was told by Dr. Guidry, who had recently examined the child. His brother, Raoul, in a most positive manner, denied that he was guilty of any such act. Relator's mother also denied positively the charges made by her little grandaughter, and she said further that some one was always in the house, either she or her young daughter, or both, being constantly at home. In this she is corroborated by relator's father and sister and also by their neighbor, Oscar Savoie, who, on the day of the trial, said that he was 82 years old.

It is well to note that the child testified that the alleged incident occurred in the wintertime, yet she could not fix the time with reference to Christmas, although the holidays had just expired. Moreover, she stated that it was in the afternoon and at that time the sun was high. The testimony of Mr. Eli Mouton, driver of the school bus, is to the effect that he usually brought the child back home about 5:30 in the afternoon and in winter, at that time, the sun is down. Furthermore, it is shown by the child's testimony that, on the day following the alleged outrage, she was taken to Dr. Guidry's office, who fixed the date as May 27, 1934, and positively stated that there was not the slightest evidence of any violence having been committed upon the person of the child, that the child was suffering with

a common ailment, known as vulva vaginitis, for which he prescribed.

We therefore conclude that not only did respondents fail to prove this alleged assault on the part of relator's young brother by a fair preponderance of evidence, but the overwhelming weight of the evidence is in favor of relator.

With reference to the other grounds relied upon by respondents to gain the custody of the child, without going into the details of the testimony, suffice it to say that we are not impressed with the evidence offered by respondents. In many instances, the testimony on their part is shown to be grossly exaggerated, and in others, most unnatural. The record is replete with incidents which point to the fact that most of their testimony was prompted by their zealousness and that of their daughter and son-in-law to gain the custody of the child.

It is urged most earnestly by the counsel for relator and the counsel for respondents that, in view of the serious breach which exists between relator and respondents, due to the seriousness of the charges made in respondents' reconventional demand, it is for the manifest interest and welfare of the child that to whomsoever we may award her custody, it should be absolute and permanent. We agree with them for obvious reasons.

For the reasons assigned, the judgment of the lower court is annulled and set aside, and it is hereby ordered, adjudged, and decreed that relator, Antoine Burleigh, be awarded the exclusive and permanent care, custody, and control of his minor daughter, Gussie Burleigh, and respondents, O'Niell Savoie and his wife, Mrs. O'Niell Savoie, are hereby ordered and directed to immediately surrender and deliver the child to her father, relator herein. All costs of court to be borne by respondents.

ODOM and ROGERS, JJ., dissent.

O'NIELL, Chief Justice (dissenting).

In the original suit of State ex rel. Burleigh v. Savoie, 176 La. 115, 145 So. 285, I was of the opinion that the facts and conditions were not such that the father should be deprived of the possession and care of his child; but the facts of the present case convince me that the child should remain with the grandparents, and that the decree of the district judge to that effect should be affirmed.