HAMLIN, Justice ad hoc.
This matter involves a controversy over the custody of the minor, Emmie Sue Brode, born in 1946 of the union of Chester A. Brode and Mamie Sue Hatcher Brode, whose marital domicile was at Plaquemine, Louisiana, Iberville Parish.
Mrs. Brode died on April 5, 1956, from a lingering illness of cancer. Prior to her death, she was confined for approximately a year in a hospital in Clinton, Louisiana, the home of her family. Relator gave his consent for Emmie Sue to accompany her mother and be near her bedside during her last illness. During this time, Mrs. Brode’s brothers and stepmother, who were devoted to her, cared for Emmie Sue, enrolling her in school and looking after her personal necessities.
Relator visited his wife at intervals during her last illness, although the record reflects that their marital life had not been peaceful due to constant conflicts between Mrs. Brode and Mr. Brode’s sister, Miss Ollie Brode, who resided with them.
After his wife’s funeral, Mr. Brode acceded to Monroe Hatcher’s request that Emmie Sue remain a few days in Clinton with the Hatcher family. On April 8, 1956, he further consented to permit Emmie Sue to remain in Clinton to complete the school term. The Hatchers then refused to release Emmie Sue to him.
Relator filed habeas corpus proceedings against Monroe Hatcher and Mrs. Embry Hatcher in June, 1956, alleging that they were detaining his child against his will and wishes. Monroe Hatcher filed an exception of misjoinder of defendants, averring that Emmie Sue Brode was in the custody, control, and under the supervision of her maternal uncle, Embry Hatch-er. Mrs. Embry Hatcher filed an exception of no right or cause of action. Relator then filed a second petition, naming Embry Hatcher as defendant and praying that Embry Hatcher be ordered to release and deliver Emmie Sue Brode to him. Hearing was set for August 8, 1956. The defendant filed an answer on that day, the most cogent averments being:
“ * * * relator is advanced in years and unable to properly attend to him *641 self much less a small girl, that relator’s home is not a fit place to raise a child and especially a young girl ten years of age.”
“ * * * relator has a sister living with him who is not a proper person to rear a small girl, that Emmie Sue Brode is definitely afraid of her, that she is a dangerous person with whom to leave a child because of her many peculiarities and idiosyncrasies. Further that this sister is in need of a caretaker and has even gone to the extent of threatening to kill Emmie Sue which upset her violently and has instilled in her a constant fear and dread of such eventuality.”
“ * * * while Emmie Sue was kept by relator and his sister, that she was not properly bathed, nor properly clothed and not properly fed and as a result thereof, was not receiving the proper attention a minor girl should receive, which was detrimental to her health and physical well being.
******
“ * * * relator, because of his age, infirmities, actions and unrestrained temper, needs someone to care for him and consequently is unable to care for or rear a ten year old girl.”
After hearing, the trial judge recalled the writ of habeas corpus previously issued and dismissed relator’s suit. In his reasons for judgment, he stated:
“There was evidence brought out in this trial that Aunt Ollie — on one side they said that Aunt Ollie was crazy., that she was incapable of handling and treating the child. And on the testimony offered by the people of Plaque-mine, substantial citizens, they testified that Aunt Ollie was eccentric and has peculiarities, and that she was no society belle but she was a substantial citizen. The Court was definitely impressed with the fact that Aunt Ollie was not in Court. That Aunt Ollie was not here to fight for her niece. That Aunt Ollie was not here to testify. And the counsel for Mr. Hatcher motioned for the Court or entered a plea before the Court of sending down and getting Aunt Ollie to testify but he gave up the idea for some reason. It was hardly practical because the trial was well along its way before this motion was made. There was evidence offered here that Aunt Ollie had threatened this child for playing with other children. There was testimony and evidence to the effect that she had at one time told this child, ‘I’ll kill you if you play with those children again.’ Counsel for Mr. Brode explained that by saying that any parent will remonstrate with their children, ‘I’ll beat the hide off *643 you,’ or ‘I’ll wring your neck,’ or various and sundry terms of that nature. The Court understands that, but it is hard for the Court to understand a grown person telling a child, ‘I’ll kill you.’ * * * The Court makes a distinguishment from that and, ‘I’ll kill you.’ I think that when she said, ‘I’ll kill you’ the child already feared her aunt and it made a very severe impression upon her young memory. * * * The father under the law has paramount right to his child and heretofore the cases have been almost down the line that parents have absolute right, paramount right to the custody of his child, their child. Mr. Brode is an elderly man. Mr. Brode is a bachelor. Mr. Brode has to attend to his business activities. Mr. Brode has not attempted to see his child since it has been up here. Mr. Brode has not written the child but two or three or four letters since it has been here. The Court knows, and Mr. Brode knew, and I told Mr. Brode that he could see and visit with his child any time that he wanted to. That he had a right to. The Court would see that he had the right, yet this has not been done. I believe according to some of the modern cases, some of the modem decisions rendered by the State Supreme Court that they have a tendency to overrule this paramount right of a parent to a child. They seem to look to the welfare and the happiness of the child. * * * I do believe Emmie Sue Brode is happy in her home, her present home. She is going to school here. She’s making good grades. She is getting the love and care that a child of her nature needs. I believe that her welfare — though it may be a drastic decision — even though I may be overruled by the Supreme Court — I believe the welfare of the child is better off where she is at present. * * * ”
Relator has appealed to this court, alleging that the trial court erred in reaching the following conclusions:
1. That a parent does not have the paramount right of the custody of his or her child.
2. That because Mr. Brode is engaged in business, he is not the proper person to raise his own child.
3. That because a small child preferred to remain with her uncle and aunt, the father should be deprived of her custody.
4. That Emmie Sue feared Miss Ollie Brode, sister of relator.
5. That Miss Ollie Brode, who was not a party to this suit and was not advised that she would be made an issue, should have been in court.
We agree with the trial judge .that in a case of this kind, involving the *645 custody of a child, someone will be very badly hurt. However, our jurisprudence is well settled that:
“ * * * the courts are not authorized to interfere with a parent’s authority over his or her children, except if the court is satisfied that he, or she, will neglect them, or expose them to improper influences, in which case the paramount interest which society has in seeing to it that they be well taken care of and properly brought up would justify the court in making some other disposition of them. Ex parte Lincoln, 128 La. 278, 54 So. 818; State ex rel. Martin v. Talbot, 161 La. 192, 108 So. 411; State ex rel. Bethany v. Corley, 172 La. 266, 134 So. 87, and the burden is on those resisting the parent’s right to show his or her disqualification or unfitness to have the custody of the child. State ex rel. Burleigh v. Savoie, 185 La. 985, 171 So. 98; State ex rel. Perdue v. Carkuff, 182 La. 920, 162 So. 729; Heitkamp v. Ragan, 142 La. 81, 76 So. 247. * * * ” State ex rel. Martin v. Garza, 217 La. 532, 46 So.2d 760, 762. (Emphasis ours.)
In Heitkamp v. Ragan, 142 La. 81, 76 So. 247, we clearly stated:
“The law clearly makes it the privilege and the duty of the father to rear and provide for his children; and, on the death of either spouse the tutorship of the minor children belongs of right to the surviving father or mother. C.C. 250. The child remains subject to the control of its parents, or the surviving parent, until his or her majority or emancipation. C.C. 216. And the right of appointing a tutor, whether a relation or a stranger, belongs exclusively to the father or mother dying last. C.C. 257.”
 We reiterate that which we have held on many occasions — ordinarily, parents have the natural and legal right to the custody and care of their minor children. Therefore, it follows that relator does have the paramount right to the custody of his minor child, Emmie Sue. However, his right in this respect is not unquestionable. State ex rel. Conerly v. Sonier, 209 La. 138, 24 So.2d 290.
“* * * We have consistently held that, although parents have a paramount right to the custody of their minor child, this right is not an absolute one and must yield to the superior right of the State to deprive a parent of the custody of his child if the best interest and welfare of the child require it. State ex rel. Guinn v. Watson, 210 La. 265, 26 So.2d 740; State ex rel. Graham v. Garrard, 213 La. 318, 34 So.2d 792, and cases therein cited; State ex rel. Mouton v. Williams, 222 La. 457, 62 So.2d 641. In *647 State ex rel. Harris v. McCall, 184 La. 1036, 168 So. 291, 292, this court said:
“ ‘Although parents have a natural right to the custody of their children, nevertheless the state has an interest in children which goes beyond the mere parental right. In all cases involving their custody, the welfare of the children must be considered, and should prevail over the mere parental right to their possession. * * * ’ ” State ex rel. Deason v. McWilliams, 227 La. 957, 81 So.2d 8, 9.
Relator was seventy-two years of age at the time of trial in 1956. The record discloses that he owns property and receives an adequate income to support his daughter. He lives in a comfortable home, which was renovated through the efforts of his deceased wife. Five witnesses testified as to his good character and business ability. Frank C. Grosch, a building contractor and owner of a Western Auto Store, testified that relator attended Sunday School and in the past had brought his daughter with him. Sheriff C. A. Griffon of Iberville Parish testified that relator was a fit person to raise his own child. Nowhere in the voluminous testimony of the defendant’s witnesses do we find any evidence that would lead us to a conclusion that relator is not a good man. There is evidence in the record that he became excited during one of the hearings in this matter and used the words, “God-damned liar”, but we do not believe that this is sufficient to hold that he is not a good father. However, relator himself testified that he was engaged in business which necessitated his being out of his home at times. He said that his sister, Miss Ollie Brode, lived with him and that her mental condition was good. He denied that she had ever threatened his child.
Mrs. Zack Hatcher, stepmother of the deceased Mrs. Brode, testified as follows-
“Q. What would you say with regard to the mental condition of Miss Ollie Brode — would you think she was mentally competent to raise a child? A. I certainly do not, and she is afflicted. I wouldn’t hold a thing she does or says against her, because she is an afflicted person, and handicapped. Her brother sat in my living room when his wife was desperately ill and when she was a corpse, and said — he was enumerating the troubles he had had in his lifetime — and he said, ‘My sister had an accident when she was 11 years old that ruined her life — ruined her life.’ And Mrs. Embry Hatcher was sitting there too.
* * * * * *
“Q. Do you think she is competent of taking care of that child and state your reasons. A. Well, as I said, I think she is an afflicted person *649 because of the accident. I believe that. And he had told me himself that she had an accident that had ruined her life. Anyone can see. I taught school for 21 years — I studied psychology, and I have had occasions to judge people— many times — and I know that mentally normal people — who are mentally normal people and who are not.
“Q. Do you think she has the mental competency to care for his daughter or any other child? A. No, I do not. She would not keep her clean. She would not give her the proper food. Her appearance is not good. She herself is untidy.”
Mrs. Zack Hatcher’s testimony is somewhat corroborated by some of the witnesses for the defendant, and we are confronted with the question of whether Emmie Sue will be exposed to improper influences. State ex rel. Martin v. Garza, supra; Ex parte Lincoln, 128 La. 278, 54 So. 818.
Plaintiff’s witnesses testified that Miss Ollie was a down to earth woman, and Sheriff C. A. Griffon testified that she was normal. However, they did not testify as to her ability to raise a child of such tender years as the minor herein involved. Relator made no statement as to his plans for the physical and moral upbringing of his child, and he repeatedly referred to the fact that his sister (Miss Ollie) had assisted in raising Emmie Sue during the time she was at home with him. We infer from his testimony that his sister would continue to exercise some control over his daughter.
The trial judge and counsel for relator and counsel for defendant met in the judge’s chambers and questioned Emmie Sue. The court’s report is as follows:
“The Court: I will dictate this into the record, our conversation with Emma Sue Brode. If I make an error, please correct me and if you have anything to add to it, I certainly will let you add to it. The Court interrogated Emma Sue Brode relative to where she was living now with her aunt and uncle, Mr. and Mrs. Embry Hatcher. She said that she was happy there; she loved Uncle Embry; she loved Aunt Edna; that she liked to live here better than in Plaquemine. The Court further interrogated her as to whether the above mentioned Uncle and Aunt were kind to her and she said that they were very kind to her. She said, also, that her grandmother, Mrs. Alice Hatcher, was very kind to her and she loves all of them. The Court interrogated her relative to her father, Mr. Brode, and she said that she loved her father; that he was kind to her, but she still contended that she would rather live here. The Court interrogated her relative to her Aunt Ollie and she said, I believe, that she loved her Aunt Ollie — is that correct, Mr. Ponder?
*651 “Mr. Ponder: Yes.
“The Court: But, upon further questioning, she seemed to resent Aunt Ollie because Aunt Ollie and her mother, Mrs. Mamie Sue Hatcher Brode, did not get along. Mr. Obier questioned her and she said that her father was kind to her; that her father took her to Sunday School, but only just before her mother became sick; that her mother took her to Sunday School until she was able to go alone and then her mother had to stay and take care of the restaurant while she went to Sunday School. She said in answer to Mr. Obier’s questioning that her father was kind to her. She said that her Aunt Ollie never combed her hair and they would not let her father comb her hair because he would almost pull it out. However, she said that you certainly didn’t mean to, Mr. Brode. And, she testified to Mr. Ponder’s questioning that she loved her Aunt and Uncle and her Grandmother and that she made about the same grades here as she did in Plaquemine, but that she considered this school a little bit harder than Plaquemine or was it vice versa?
“Mr. Ponder: I think it was vice versa because they didn’t have the study period here and they did in Plaquemine. That made it a little harder.
“The Court: * * * She also said, on Mr. Obier’s questioning, that her Aunt would lay down with her at night —that Aunt Ollie would lay down with her. But, she seemed to indicate and she stated that she never asked her Aunt to lay down with her unless she was scared of the dark. The Court questioned her relative to whether Mr. or Mrs. Embry Hatcher had coached her as to what to say. She said that they had not told her what to say to me or to anyone else. Now, the Court stated to her that this was her life that she had to live it, and was she sure that she definitely wanted to live up here with her Aunt and Uncle when she had a right to go back to her Father, if she wanted to. She said that she still wanted to live with her aunt and uncle. She indicated, and if I am wrong in this we will strike it, that she was somewhat happier here than she was down there, but she was very plain that her father was always very kind to her and that she loved him. If I have left out any essential element, will you please add to it?
“Mr. Ponder: There is one thing, Judge. I don’t know if I asked her or if you asked her. Had Aunt Ollie made any threats to her and she said that one time she—
“The Court: Yes. I will state that. Mr. Ponder questioned her as to *653 whether her Aunt Ollie had ever threatened her and she said that on one occasion she had threatened to kill her for playing with some children. Then, Mr. Obier questioned her relative to the children — The Court asked her would she let her play with children and she said yes she would let her play with other children but that she would always complain and fuss about it after the children left.
“Mr. Obier: I didn’t get that impression.
“The Court: Did you, Mr. Ponder ?
“Mr. Ponder: That was my understanding.
“The Court: Well, we could strike it from the record, if you don’t want it in there. That is the impression that I got, that her aunt would fuss after— after the children, but I asked her would she let children come to her home and play and she said yes but that she would fuss about it after they left. You didn’t get it that way, Mr. Obier?
“Mr. Obier: I didn’t understand it that way.
“The Court: Did you, Mr. Ponder?
“Mr. Ponder: My impression was just like you gave it — on that one occasion where she said she would kill her for playing with children—
“Mr. Obier: Some particular children, wasn’t it?
“Mr. Ponder: Some particular children. Then, on this other occasion when the Court and Mr. Obier asked if she was allowed to play with children and she said yes but that Aunt Ollie always fussed.
“The Court: Well, that was about the way it was. Do you agree on that Mr. Obier?
“Mr. Obier: I understood that Aunt Ollie would fuss at her mother for not being at home.
“The Court: Well, do you gentlemen agree that that about covers the situation ?
“Mr. Obier: That is about it.
“Mr Ponder: That is a whole lot better than I could have done, Judge.
“The Court: I did the best I could.”
Since the right of the State is superior to that of the parent, and since we have not had the benefit of Miss Ollie’s testimony, we feel that it would be detrimental to Emmie Sue’s welfare to order her returned to her father without a legal determination of Miss Ollie’s qualifications, if Miss Ollie is to take care of her. Therefore, we think that the trial court should have the right to observe and question Miss Ollie. On the other hand, if Miss Ollie is not to take care of Emmie Sue, it should be *655 shown by relator what arrangements he intends to make for her care.
Under the circumstances of this case, we agree with relator that the trial court was in error regarding Miss Ollie’s absence on the day of hearing of the habeas corpus proceeding. Hearing was set for and took place on August 8, 1956, and the defendant filed his answer on that day. It was in his answer that defendant attacked the ability of Miss Ollie to take care of Emmie Sue. As stated in State ex rel. Martin v. Garza, supra, the burden of proof is on those resisting the parent’s qualifications and fitness. Here, the burden was on the defendant. This is not the type of case where a . presumption should be asserted against relator for not producing his sister as a witness. We also find that during the trial of the proceeding, counsel for the defendant requested an instanter subpoena for Miss Ollie and then withdrew his request. Relator stated that it would not injure her health for her to appear in court. The record also indicates that the trial judge was anxious to finish hearing the case on the day of trial, because of a crowded docket.[1]
The record is replete with evidence as to the moral and financial ability of the de *657 fendant and his wife to take care of Emmie Sue, and we have no' doubt that she would enjoy a life befitting a girl of her years if she made her home with them. The testimony and the conclusions of the trial judge also indicate that Emmie Sue is happy with her Uncle Embry and his wife. However, these factors are only to be weighed. They cannot be controlling of the custody of the child.
The only fair and equitable decree we can render is to remand the case to the lower court, in order that it may hear the relator’s testimony as to his plans for taking care of his daughter and hear the testimony of Miss Ollie Brode as to her actions toward Emmie Sue in the past and what her actions will be toward her in the future. This will determine whether Emmie Sue will be exposed to proper or improper influences were she to be returned to her father.
In commenting further upon the reasons for judgment of the trial judge, we would like to observe that while it is true that relator is an elderly man, this is not a ground for depriving him of the custody of his child. It is clear that he loves his daughter dearly, and we cannot help but remark that efforts should be made for him to visit with Emmie Sue during the interim of this remand.
As to the statement of the trial judge to the effect that relator has not attempted to see his child since she has been in Clinton, the record is clear that friction exists between him and the Hatcher family and that he is reluctant to go to their residences, although defendant’s witnesses testified that he is welcome. The trial judge remarked that he had urged relator to visit his child, and we believe that all parties should assist in carrying out this request.
As to the statement of the trial judge to the effect that relator has not written his child but two or three or four letters since she has been in Clinton, relator testified that he stopped writing to his daughter because he did not believe she received his letters, although the Hatcher family testified that they delivered his letters to her unopened. Evidently relator did not receive letters from Emmie Sue, as the record does not clearly show how often she wrote her father.
However, these observations by the trial judge are not sufficient to deprive relator of the custody of his child.
For the reasons assigned, the judgment appealed from dismissing relator’s suit is reversed, annulled, and set aside, and it is now ordered that the case be remanded to the district court for proceedings consistent with the views herein expressed. All costs of this appeal are to be borne by appellee, Embry Hatcher; all other costs are to await the final disposition of the cause.
PONDER, J., absent.
*659 McCALEB, J., dissents in part.

. Mr. Ponder: “If the Court please, the question is the fitness of the parent, and in order to determine the fitness, it is naturally incumbent upon the Court to determine the place of abode of the person who is ashing for the custody. I would like an instanta subpoena to be issued for Miss Ollie Brode, since the question is going to come up about that.
“I would like to see if she will come to Court. Now, if she can come to Court today, I would like to use her. If we complete the trial of this case and she’s not here, I realize I cannot insist on the Court holding the case open for her testimony. But since this question has come up, — I don’t know this lady — but the information I have is certainly to the effect that as long as she is in the home she needs someone to take care of her, and it certainly wouldn’t be a fit place for the child to be.”
Mr. Obier: “If the Court please, I did not anticipate particularly that they were going to attack the mental capacity of anyone. I think that we have quite a few people here in the Court, reputable people, the Sheriff of the Parish of Iberville, who know Mr. Brode and who know his sister and who can testify, and I don’t think that it is necessary.”
The Court: “Mr. Ponder, if you feel like you’ve got to have this witness, I will send after her, but now, I don’t want to do anything to injure her health or anything to — ”
Mr. Brode: “It won’t injure her health.”
Mr. Ponder: “Judge, suppose we put it this way — I’ll go ahead with my questions, and I’ll withdraw my request for a subpoena right now for her, and if it develops later on that we need her, we’ll get it.”
Court: “I will also warn you gentlemen this — I hope — we may not be able to do it — but I hope to complete this case today. If I don’t I have criminal cases for Thursday, Friday, and Saturday I have another civil case. In fact, it’s a civil case of this nature that I have to try. If we do not complete this case today, it will be at least the middle of next week before I can continue. I would like to finish today, but I don’t know whether we can do it or not. I also state this, that I’m prepared to go into a night session if necessary.”