some new act capable of transferring it to some one else.

## III

■ But all that is wholly aside from the question presented in this case which is whether a will which falls by law upon the birth of a legitimate child, posterior to its date, but is perfectly valid in form, may be reinstated by a subsequent will also valid in form, by simple reference thereto, and without repeating all the provisions thereof.

■ And it may be conceded at once that a will cannot be made by mere reference to another document not itself a will, or to a former will that is invalid because of want of proper form. All the French authorities agree on that.

■ But when a will, otherwise valid, falls by the birth of a legitimate child, posterior to its date, that will is merely revoked by law instead of by the testator.

And a will that is revoked by law is no more effectively revoked than if revoked by the testator himself. The effect is the same in both cases; the will was valid, but cannot be executed simply because it has been revoked.

The French authorities to which we have been referred, and none have been cited to us holding the contrary, hold that when a testator has made a will, valid in form, and has afterwards revoked it, he may retract the revocation and reinstate the will by another will, valid in form, as effectively as if he made a new will containing the same provisions. Dalloz, Rep. de Legislation, etc., vol. 16, p. 712, No. 2492, citing Merlin and Troplong; Baudry-Lacontinerie, vol. 11, p. 361, No. 2727 (vol. 2 of Donations and Testaments).

■ And in our opinion that is sound doctrine. The policy of our law is to maintain

a will, if possible. Godden v. Burke's Ex'rs, 35 La. Ann. 160. And it seems to us that where a testator has clearly expressed, in due form, his intention to persist in a will, also in proper legal form, his wishes thus expressed should not be disregarded because of some doubt that might arise as to whether the particular method of expressing his wishes be strictly regular.

We are referred to a number of cases in which the court uses the expression that a will which falls by the birth of a legitimate child, posterior to its date, is void. But those are all cases in which the testator had done nothing thereafter to indicate his intention to persist in the will, and hence they have no application to the case at bar.

### Decree.

The judgment appealed from is therefore reversed, and it is now ordered that plaintiff's demand be rejected at her cost in both courts.

LAND, J., dissents.

(128 So. 275)

## STATE ex rel. STOCKSTILL v. SPIERS et ux.

### No. 30488.

March 31, 1930.

Rehearing Denied May 5, 1930.

Harvey E. Ellis, of Covington (Purnell M. Milner, of New Orleans, of counsel), for appellants.

Morgan & Simmons, of Covington, for appellee.

THOMPSON, J.

This is a proceeding by habeas corpus on the part of the father to get possession and control of his baby girl, not quite fifteen months old when this proceeding was filed.

The father and both the paternal and maternal grandparents of the child reside in Mississippi.

The father and mother of the child were married in Mississippi on December 2, 1927, both being under age, and the child was born on October 22, 1928. The mother died at the home of her parents November 13, 1929.

The defendant W. A. Spiers is the grand-uncle of the child, and his wife is the grand-aunt.

These defendants have no children of their own and have had the little girl in their home and under their direct and personal care and attention practically all of the time it has been in the world.

The district judge after reviewing the testimony thought the parental right ought to prevail, since the home of the paternal grandparents with whom the father lived was as favorable for the interest and welfare of the child as was that of the defendants.

There was quite a lot of testimony introduced on the trial of the case concerning the moral fitness of the father to have the care and control of the child, and of his financial ability to properly raise and educate it.

Practically all of the witnesses introduced by the relator and who reside in the community where he lived, including his mother and father, testified that he bore a good reputation and was a fit person to have the care and custody of his child.

There were others, however, who had known the young man for many years, who testified that he was not a suitable person to have the care and raising of the child, because he was young, reckless, and wild, and knows nothing of the raising of children.

On the other hand it is conceded by the trial judge that the defendants are of excellent reputation, that they have great affection for the child and there was no doubt in the judge's mind that if the child was placed in their custody it would be reared in a christian home.

We regret that we are unable to agree with the conclusions reached by our learned brother of the district court that the interest and welfare of the child will be as safe if intrusted to the father as it will be if left with the defendants.

Our appreciation of the testimony is that the interest and happiness of the child, which alone is to be considered, will be best subserved and advanced if the child remains in the hands of the defendants where it was placed by the mother before her death.

We would not detract one iota from the good character of the father of the child as attested by his witnesses.

That may be conceded for the purposes of this discussion.

The fact remains however that he is a very young man with an unsettled nature and with no experience with caring for and raising children. He has no home of his own, and had no matrimonial domicile other than at his parents home or the home of his wife's parents.

He has no property, no money, and has not been able to keep and hold a permanent job. He got in debt before his wife died. At the time of the trial he was a helper to his father as a saw filer in a sawmill. He and his wife separated shortly after the child in question was conceived. He carried his wife to her parents to live and he went to his parents, the only home he ever had. He tried to induce his wife to get rid of the child and sought information as to how to bring about an abortion.

Of course he denied this but his denial is overcome by a preponderance of the evidence.

After the separation he told his wife when he went to see her at her mother's home that he did not love her and did not intend to live with her any more. And, after the baby was born, he visited the home of these defendants presumably to see the baby.

On one of these occasions he asked Mrs. Spiers if she did not think that Beatrice, his wife, ought to give him a divorce, that he was invited out to parties and he could not enjoy himself knowing he did not have a divorce.

In view of these circumstances and conditions we are constrained to believe that it would be hazarding the interest, welfare, and happiness of the child to take it away from these defendants and turn it over to the father.

Besides as we have stated the father had no home of his own in which to rear the child.

It is conceded that if the father succeeds he will turn the child over to his parents or place it in some other home, and, under the evidence, the surroundings of the home of his parents are not as favorable for the interest and well being of the child as are those of the defendants home.

It is very clear from the evidence too that the attachment of the father and his parents for the child could not be, under the circumstances, as great as that of these defendants. The father has seen very little of the child and the child has never been in the home of its paternal grandparents. They are practically strangers to the child.

The defendants took the mother of the child, who was their niece, when she was two years old and raised and educated her.

Shortly after the birth of the child the mother came to the defendants home to live bringing the child with her.

She expressed a desire to prepare herself to teach school.

The defendants sent her to Tulane University and kept the child, hiring a special nurse for it. They furnished the child nourishment and medical attention. In fact the defendants have been a true, devoted, and loyal father and mother to the child.

Some time in the fall of 1929 the mother, with the baby went from the defendants home to her mother and fathers home on a visit and while there the mother took suddenly ill. The defendant Mrs. Spiers went over and got the child and brought it back to her home to care for it. When the mother be-

came worse Mrs. Spiers went back to her bed side with the baby, and remained until death came.

After the funeral Mrs. Spiers returned with the child and has had possession since that time. The father gave very little attention to his wife after the separation and before the birth of the child. He contributed nothing to the support of his wife. After the child came he sent some money monthly for the benefit of the child but the amount was not sufficient to buy the milk used by the child.

There are other facts which we could state from the record, but those stated are sufficient to show that for the present at least, it is for the best interest and welfare of the child that it be left in the care and custody of the defendants. In State v. Michel, 105 La. 746, 30 So. 122, 124, 54 L. R. A. 927, it was said:

"While the father may have the first title to custody of the children by nature, his claim may be disregarded by the court, acting on a principle of natural justice."

In Ex parte Ryan, 126 La. 449, 52 So. 573, it was said:

"It is a matter in which the state has an interest beyond the mere right and authority of the father. The welfare and happiness of the child are involved and have to be considered by the court."

And again in State v. Lewis, 145 La. 23, 81 So. 742, it was said:

"Though a father is, as a matter of right, entitled to the tutorship and possession of his children, his right in that respect is not unquestionable or absolute."

In the more recent case of State ex rel. Peter v. Stanga, 161 La. 978, 109 So. 783, this court said:

"Welfare of child will prevail over technical right of father to possession. * * *

"The real issue involved, as we view it, is not so much whether the cold technical right of the father to the possession of his child should be maintained, as it is whether, from the standpoint of the welfare of the child, she should be permitted to remain in the care of her grandmother."

The same considerations which justified the court in the Stanga Case in saying that "every humane consideration suggests that the child should not, at this time, be separated from her devoted grandmother," leads us to the conclusion that the little girl Joreah should not at this time, when she needs the constant and undivided care and attention of a mother, be taken from her maternal grandaunt and maternal granduncle who have been so faithful in taking care of the child both prior and subsequent to the death of the real mother.

The judgment appealed from is set aside, and the demand of the relator is rejected with costs.