81 So.2d 8 (1955)
227 La. 957
STATE ex rel. Hubert M. DEASON et ux.
v.
Maurice W. McWILLIAMS et ux.
No. 42085.
Supreme Court of Louisiana.
April 25, 1955.
Rehearing Denied May 23, 1955.
Wood & Jackson, Leesville, for plaintiffs-appellants.
*9 Gravel & Downs, Alexandria, for respondents-appellees.
HAWTHORNE, Justice.
This is a habeas corpus proceeding in which relators, Mr. and Mrs. Hubert M. Deason, seek the custody of a minor child born to them on October 6, 1953. This suit was instituted on April 7, 1954, against respondents, Mr. and Mrs. Maurice W. McWilliams, who had had custody of the child from the time he was a few days old. After trial on the merits the lower court by order continued the custody of the minor child in respondents and rejected relators' demands at their costs. From this judgment they have appealed.
As this is a habeas corpus proceeding, the custody of the child is the sole issue to be decided by this court. We have consistently held that, although parents have a paramount right to the custody of their minor child, this right is not an absolute one and must yield to the superior right of the State to deprive a parent of the custody of his child if the best interest and welfare of the child require it. State ex rel. Guinn v. Watson, 210 La. 265, 26 So.2d 740; State ex rel. Graham v. Garrard, 213 La. 318, 34 So.2d 792, and cases therein cited; State ex rel. Mouton v. Williams, 222 La. 457, 62 So.2d 641. In State ex rel. Harris v. McCall, 184 La. 1036, 168 So. 291, 292, this court said:
"Although parents have a natural right to the custody of their children, nevertheless the state has an interest in children which goes beyond the mere parental right. In all cases involving their custody, the welfare of the children must be considered, and should prevail over the mere parental right to their possession. State ex rel. Dartez v. Dartez, 154 La. 722, 98 So. 164; State ex rel. Peter v. Stanga, 161 La. 978, 109 So. 783; Davis v. Willis, 169 La. 13, 124 So. 129; State ex rel. Stockstill v. Spiers, 170 La. 454, 128 So. 275."
As we pointed out in State ex rel. Guinn v. Watson, supra, the courts of this state have invariably followed the rule that the welfare of the child is of paramount importance in determining who is entitled to its custody in a case of this kind. Cited in support of this proposition were the cases of State ex rel. Castille v. Cooke, 183 La. 404, 164 So. 153; State ex rel. Harris v. McCall, supra; State ex rel. Lasserre v. Michel, 105 La. 741, 30 So. 122, 54 L.R.A. 927; Ex parte Ryan, 126 La. 449, 52 So. 573; State ex rel. Peter v. Stanga, 161 La. 978, 109 So. 783; Davis v. Willis, 169 La. 13, 124 So. 129; State ex. rel. Stockstill v. Spiers, 170 La. 454, 128 So. 275. See also Green v. Paul, 212 La. 337, 31 So.2d 819. Moreover, it was recognized in State ex rel. Martin v. Garza, 217 La. 532, 46 So.2d 760, that by his conduct a parent can forfeit his parental right to the custody of his child.
Mr. and Mrs. Deason were married in Leesville, Louisiana, in 1948, and have made their home there ever since. After the birth of their third child they decided they did not want any more children, and Mrs. Deason had an operation performed to render her sterile. When in spite of this she became pregnant again, she concealed her pregnancy from everyone except her husband, even from her mother and the other members of her family who lived in the same community. About this time Mr. Deason joined the Navy and left Leesville. Some three months before the birth of this fourth child, Mrs. Deason discussed privately with certain persons in Leesville the matter of placing her unborn baby with someone else to rear. With her husband's knowledge and approval she decided to give the unborn baby to Mr. and Mrs. McWilliams, who had no children of their own and were anxious to adopt one. Mrs. Deason impressed on the McWilliams that they were to keep secret from everyone, especially her relatives and friends, the fact that she was the real mother of the child. When the birth of the baby drew near, Mrs. Deason told her friends and relatives that she was going to the hospital to have a tumor removed. The baby was delivered by caesarian section in a hospital in Leesville and was almost immediately given to Mr. and Mrs. McWilliams without *10 his mother ever seeing him. As they had agreed to do, Mr. and Mrs. McWilliams paid all hospital and medical expenses and doctor's bills incurred in connection with the birth of this child, even though the mother and father were not in destitute circumstances and were themselves financially able to pay these expenses.
On October 8, two days after the birth of the baby, who was given the name Larry Wayne Deason, Mrs. Deason executed an authentic act of surrender in favor of the respondents, in which she surrendered to them all of her rights with respect to the child, and acknowledged that she delivered the care, custody, and control of the child to the respondents for the purpose of adoption. On October 10 a similar act was executed by her husband, who was stationed in South Carolina with the Navy.
About a month later Mrs. Deason, who had temporarily joined her husband in South Carolina, wrote Mrs. McWilliams that her family would cause trouble if the baby's real parentage ever became known. The letter reads as follows:
 "Nov. 12, 1953
 "Charleston, S. C.
"Dear Mrs. McWilliams,
"I wanted to call you before I left to tell you this, but didn't get the chance, so I hope you don't mind my writing. There were quite a few rumors going around home before I left about me giving my baby to you, but I convinced everyone it wasn't me. Obviously, someone talked & from what I could find out it was your sister-in-law, Mrs. Baggett. I told that a Mrs. Beason had a baby while I was there & that you might have gotten it, but that I knew nothing about it. So if anyone ever asks you if the baby was ours, don't ever mention our name. Use some other name, but for your own sake, please don't use ours. It'll only cause trouble so always deny it. Keep using the Beason name if you wish, but if it ever becomes a fact that the baby was ours, my family will cause you trouble. I know the baby has a good home & both my husband & I are satisfied with the arrangement, but it mustn't become a fact that you got the baby from us. The talk has probably died down now since I'm back here, but I just wanted to tell you this, in case any of my folks should come to you. Please deny any connection with us.
 "SincerelyMrs. Hubert Deason"
In spite of Mrs. Deason's efforts to keep the birth of the child a secret, news of what had happened leaked out, and Mrs. Deason's mother called on Mrs. McWilliams to see the baby. Her testimony reflects that she was terribly distressed and humiliated by the fact that her grandchild had been given away to strangers.
Mrs. Deason, informed of her mother's visit to Mrs. McWilliams, wrote to the attorney in Leesville who had introduced her to Mrs. McWilliams. In this letter she said that she thought she had made it plain to the McWilliams that she did not want her parents or any of her relatives to know about the baby but that apparently she had not made it plain enough. She stated that she had heard from her mother that members of her family had seen the papers which she had signed surrendering the child to the McWilliams, that she was not going to lie to her parents any further about it and had told them the truth. In this letter Mrs. Deason also stated that she wanted her child back, that she had permitted the McWilliams to have the baby for the purpose of adoption because she was on the verge of a nervous breakdown at that time and felt that the three children she already had were all she could take care of, that she had now almost recovered and was in good health, and that, if the McWilliams would permit her to have the child, she would be willing to repay them for the hospital and medical expenses which they had paid at his birth.
Notwithstanding the admissions of relatrix in this letter, she and her husband alleged in their petition in the instant suit *11 that they "entrusted the temporary care, custody and control of said minor child, Larry Wayne Deason, to Maurice W. McWilliams and his wife, Mrs. Etha Mae McWilliams, until such time as the health of petitioner, Mrs. Janice Maxine Gordy Deason, would permit her to care for and rear her said child".
The record clearly shows that, when Mrs. Deason surrendered Larry to the McWilliams, she wanted them to have the child permanently, and had no intention of reclaiming him at a later date. The trial judge in his reasons for judgment informs us that there was no evidence that Mrs. Deason was physically incapable of caring for the baby at the time of his birth. This conclusion is corroborated by the testimony of the doctor who cared for Mrs. Deason during her pregnancy. In other words, the trial judge found that the allegations of relators' petition in this respect were untrue.
In the instant case the trial judge has furnished us with written reasons for judgment in which he ably discusses and analyzes the testimony of the witnesses and reviews the jurisprudence of this state in custody cases. As these reasons show, it was only after a great deal of thought and study that he reached the conclusion that it was to the best interest and welfare of the child to leave him with respondents.
It is well settled in the Louisiana jurisprudence that in custody cases the opinion of the trial judge is entitled to great weight. Davis v. Willis, 169 La. 13, 124 So. 129; State ex rel. Castillion v. Jeunesse, 185 La. 845, 171 So. 51; State ex rel. Guinn v. Watson, supra. Moreover, all the evidence brought up in the record supports the trial judge's conclusion in the instant case. In his reasons for judgment he sums up the decisive factors in the situation as follows:
"There can be no doubt that these parents did not want this baby. They attempted to prevent its conception by attempting to have the mother rendered incapable of conceiving and did, at its birth, have her so made sterile. They concealed its approaching birth and made their people believe she had to have an operation for the removal of a tumor. They gave it away before its birth and confirmed that agreement by written authentic acts and by actual delivery of the child after birth. They never saw and never made an effort to see the baby until the day it was brought into Court, when neither evidenced the slightest interest in it. They never inquired as to its welfare or did anything else to evidence the slightest affection for or interest in the baby, until, as the Court believes, they were forced to file these proceedings by their families or some of the members thereof. The Court knows, from the irrefutable facts established, that these parents, at least for some months after its birth, did not want it and were interested only in concealing its birth from their people and it is of the very definite opinion that they do not want it now. This is not a case comparable to those in the jurisprudence, where the mother, through necessity, feels compelled, for the child's welfare, to surrender it to somebody else and thereafter finding herself in improved circumstances, wants her baby back. The circumstances of these people have not changed so as to bring about any change in their desire for the baby. Their plea that Mrs. Deason was not in physical condition to care for the baby after its birth falls upon deaf ears so far as this Court is concerned, in view of the testimony of Dr. Shaw and Relators' failure to produce the testimony of the Naval Doctors (in the absence of the non-availability thereof), since it must be considered that that testimony would not have been favorable to Relators' contention in this respect. * * *
"Being of the very definite opinion that these parents' now hollow and unconvincing declaration that they love this baby and want it is untrue and is actuated solely by the urging of someone else, the Court considers that it would be less than human to force this child upon them by awarding its custody to these Relators, nor can it, from any standpoint, believe that it would be in the interest or the best welfare of the baby to enter such a decree.
*12 "Let us consider, for the moment, how the child's interest and welfare would be affected if it should be awarded to Relators, who, as I am convinced, don't want it. Will it have an equal place in the love and affection of its parents as its brother and sisters? Will it not constantly feel that unwantedness that would most surely bring the keenest and most insufferable unhappiness? What would be the effect upon its future life and character, when, in the years to come, it learns, as it must learn, because it is now forever recorded in the public records that its parents didn't want it, tried to conceal its birth, denied its existence, gave it away, never saw or inquired about it for months and evidenced no interest in it except to be rid of it? The answer must be obvious.
"The Court is convinced, beyond any doubt, that these parents have forfeited their parental right to the custody of this child and that its best interests and welfare dictate that such custody be denied to Relators."
In urging us to reverse the judgment of the district court counsel for relators rely on State ex rel. Simpson v. Salter, 211 La. 918, 31 So.2d 163; State ex rel. Martin v. Garza, 217 La. 532, 46 So.2d 760; State ex rel. Monroe v. Ford, 164 La. 149, 113 So. 798, and State ex rel. Perdue v. Carkuff, 182 La. 920, 162 So. 729, in all of which this court returned a child to its blood parents. Relators' reliance on these decisions is ill-founded. At first glance they might appear analogous to the case at bar in that they are all habeas corpus proceedings brought by a blood parent to regain custody of a child who had been placed in another home by that very parent. The analogy ends at this point, however. If the cases cited by relators are analyzed, it will be seen that in every one of them the parent was forced to give up his or her child because of grave illness, financial difficulty, or pressing social problems, when the welfare of the child demanded that he be put in another home. Such is clearly not the case in the instant suit.
Mr. and Mrs. McWilliams own their home, have an established business, and are financially able to rear, provide for, and educate the child. They are respected in the community in which they live, their characters are above reproach, and their reputations are excellent. We are convinced that the welfare and best interest of this boy require that he remain in the permanent care and custody of the McWilliams, who, having no children of their own, took this unwanted infant and have loved and cared for him since he was a few days old.
The judgment of the district court is affirmed.
PONDER, J., dissents and hands down reason.
HAMITER, J., dissents with a written reason.
McCALEB, J., dissents with written reasons.
PONDER, Justice (dissenting).
The relators, Hubert M. Deason and his wife, in these habeas corpus proceedings are seeking to recover the custody of their minor child, Larry Wayne Deason.
The relators, the parents of three small children ranging in age from one to five years of age, realizing that another child was to be born of their marriage decided to place the infant, upon its birth, in the hands of reliable persons for adoption. Prior to the birth of the infant, Mrs. Deason negotiated with an attorney, with the view of placing the infant in a good home, and at the conclusion of these negotiations she agreed to give custody of the child, upon its birth, to Maurice W. McWilliams and his wife for adoption. The infant was born on October 6, 1953 and turned over to the McWilliams on the next day. On October 10, 1953, Mrs. Deason executed a notarial act wherein she gave consent to its adoption. A similar instrument was signed by Mr. Deason in South Carolina, where he was stationed as a member of the naval forces. Upon being informed that *13 a petition for adoption was going to be filed, Mrs. Deason made an effort to regain the custody of the infant. On refusal of the respondents to return the child to its parents, this proceeding ensued. The petition for adoption was never filed.
After evidence was adduced in these proceedings, the lower court gave judgment awarding the custody of the infant to the respondents. The relators have appealed.
We find that the notarial acts executed by the Deasons giving the custody of the infant to the respondents and their consent to its adoption is captioned: "An Act of Surrender of Minor Child For Purposes of Adoption." It is contended by the relators that these notarial acts are merely the granting of their consent to adoption which could be withdrawn prior to the filing of the petition for adoption.
It is well settled that the consent of the parents of a child sought to be adopted is essential. Furthermore, the consent once given may be withdrawn at any time prior to the final decree of adoption. State ex rel. Simpson v. Salter, 211 La. 918, 31 So.2d 163; Green v. Paul, 212 La. 337, 31 So.2d 819; State ex rel. Martin v. Garza, 217 La. 532, 46 So.2d 760.
We are not presented in this case with an act of surrender of the custody of a child to an agency for the purpose of adoption, nor are we presented with a case where the child has been declared abandoned by the juvenile court as set out in LSA-R.S. 9:401-405. If we were to consider the notarial acts in the light that they were steps taken in an adoption proceeding, there is no question but that this consent could be withdrawn under the authorities previously cited. If we consider the case as purely one of custody, the question then arises as to the fitness of the relators.
The paramount right of the parents to the custody of their child cannot be interfered with except where it is proven that the parents are morally unfit to have its custody and control or where the welfare of the child would be imperiled. Dean v. Mizell, 159 La. 975, 106 So. 534, 535; Heitkamp v. Ragan, 142 La. 81, 76 So. 247; State ex rel. Perdue v. Carkuff, 182 La. 920, 162 So. 729; State ex rel. Burleigh v. Savoie, 185 La. 985, 171 So. 98; State ex rel. Monroe v. Ford, 164 La. 149, 113 So. 798; Kearney v. Steel, 121 La. 215, 46 So. 215, 16 L.R.A.,N.S., 1004; Ex. parte Lincoln, 128 La. 278, 54 So. 818; State ex rel. Martin v. Talbot, 161 La. 192, 108 So. 411; State ex rel. Bethany v. Corley, 172 La. 266, 134 So. 87.
All parties to this suit, both relators and respondents, bear excellent reputations. There is no evidence to show any moral unfitness on their part. The relators have a comfortable home and their three other children are well cared for.
The respondents contend that the relators have in effect abandoned the child and have shown no interest in its welfare. The infant is not neglected or delinquent. The actions of the relators show that they were interested in the welfare of the child when they consented to place it in a good home where it could be well taken care of. The respondents lay great stress on the fact that the relators did not visit the child or show any interest in it until they sought to recover its custody and that their action in seeking to regain custody was prompted by Mrs. Deason's mother. Mrs. Deason testified that the reason that she wanted to give the custody of the child to the McWilliams was because she was in bad health at the time and feared that she would not be able to give it proper care and take care of her other small children. At that time her husband was in the naval forces and stationed away from home. The fact that Mrs. Deason did not wish to see the child, if it was to be adopted by the respondents, is understandable and of no particular importance because it is only reasonable to assume that she would not want to become too much attached to it.
The respondents lay great stress on the fact that Mrs. Deason did not want to have any more children, but this may be true in many cases and could not be considered as a lack of interest after the child was *14 born. Whatever attitude Mrs. Deason may have had at the time she gave the child to the McWilliams, these very proceedings show that she now wants her child back. This is not a case where the parents are seeking to recover the custody of a child from persons who have had it for a long period of time or where the child is old enough to become attached to them or other members of their family. Moreover, it would be to the best interest of the child for it to be reared with its brother and sisters. Parents should not be denied the custody and control of their children except for some grave reason.
There is no substantial reason to deny the parents the custody of this child. As I understand it, the statements in the decisions of this court that the parents' right to the custody of their child must yield to the best interest and welfare of the child are restricted to situations where the parents are unfit or the child would be subjected to improper influences. The evidence does not show that such a situation is presented in this case.
The majority opinion lays great stress on the letter of November 12, 1953, written by Mrs. Deason to Mrs. McWilliams, and while it refers to the letter of February 1, 1954, written by Mrs. Deason to the attorney, Mr. Simms, it does not reflect the pitiful appeal she made therein for the return of her child. This letter was written before the present proceedings were instituted and portrays the anxiety of the mother for the return of her child. I do not believe that I could be justified in saying that the mother did not want her child under the evidence in this case. Furthermore I do not believe that it is for the best interest of the child to give its custody to the respondents because it can never be adopted by them in the absence of the relators' consent.
The two cases relied upon by the respondents, State ex rel. Graham v. Garrard, 213 La. 318, 34 So.2d 792 and State ex rel. Guinn v. Watson, 210 La. 265, 26 So.2d 740, are not in point and involve entirely different factual situations and were cases where the child was left in the custody of the people over a long period of time, and where it might upset the child to change its custody. In this case the child was only six months of age when this suit was instituted.
For the foregoing reasons I respectfully dissent.
McCALEB, Justice (dissenting).
I am in general agreement with the views expressed by Justice PONDER in his dissenting opinion. However, at the risk of being repetitious, I deem it appropriate to set down my individual opinion in the case.
At the outset, it is well to state that I am in full accord with the law cited by the majoritythat, whereas parents have a paramount right to the custody of their child, it is not an absolute right and must yield whenever the best interests and welfare of the child require otherwise. However, it is in the application of the rule to the specific facts that difficulty is sometimes encountered. Of course, if the parents are found to be morally unfit or incapable of providing the child with the necessities of life, the correct conclusion is easily reached. And in cases where the child has been placed in the care and custody of foster parents over a long period of time and has grown to love them and to look upon them as its real parents, it may rightly be said that it would be against its welfare to disturb the status quo by giving recognition to the fundamental parental right of custody.
But, in a case like this, where the child is still an infant and the parents are capable of caring for it properly, the only basis in my estimation upon which a judgment depriving them of custody can be rightly predicated is that their past conduct has been such that it would be against the best interests of the child to place it in their care. The rationale of the opinion of the trial judge, which is approved by the prevailing opinion herein, is that the plaintiffs *15 have forfeited their right to the child. In this, I do not agree because the decision on the question of custody should not be founded on a punishment of the parents for their past acts but, rather, upon the interest and welfare of the child.
Although there can be no doubt that the mother and father of the child in this case have committed a great wrong, it is my belief that they are penitent and, if given the child, they will love and care for it and that it will be bestowed its rightful place in their household with its brother and sisters. If I am correct in this, the welfare of the child, which is paramount, will be best served by restoring it to the family of its blood relations.
I respectfully dissent.
HAMITER, Justice (dissenting).
If this were an adoption matter I would unhesitatingly agree that Mr. and Mrs. Deason could not now arbitrarily withdraw the consent for the adoption of their child which they freely and voluntarily gave in writing. See my dissenting opinion in Green v. Paul, 212 La. 337, 31 So.2d 819. But it is not, Mr. and Mrs. McWilliams having never instituted proceedings upon the notarial acts executed in their favor by the Deasons and styled "Surrender of Minor Child for Purposes of Adoption".
To be determined here, as the majority opinion points out, is only the question of custody. And I cannot conclude from the record that the interest and welfare of the child would be best served by denying such custody to the Deasons, the evidence (as I appreciate it) failing to preponderately disclose that they either have in fact abandoned their offspring or are otherwise unfit to give him parental attention and care.
I respectfully dissent.