161 So.2d 759 (1964)
245 La. 901
STATE ex rel. Roy Lamar ROTHROCK et ux.
v.
Clyde Ray WEBBER, Jr., et ux.
No. 46960.
Supreme Court of Louisiana.
February 24, 1964.
Rehearing Denied March 30, 1964.
*760 William L. Koerber, Vidalia, for plaintiffs-applicants.
Joe J. Tritico, Lake Charles, R. R. Reeves, Jr., Harrisonburg, for respondents-defendants.
HAMITER, Justice.
In this habeas corpus proceeding Roy Lamar Rothrock and his wife, Ruth Rothrock, seek the restoration of their legitimate baby daughter from Clyde Ray and Gwendolyn Huff Webber, Jr., who, at the time this suit was filed, had the custody of her and had instituted adoption proceedings based on an act of surrender previously executed by them.
The district court's dismissal of the instant suit was affirmed by the Court of Appeal. See La.App., 155 So.2d 763.
On the application of the relators we granted certiorari, the writ having issued principally on the fact that the judges of the Court of Appeal recognized and conceded that their views herein conflicted with those of the judges of the Second Circuit Court of Appeal in State ex rel. Cockerham v. Jordan, La.App., 134 So.2d 81.
In habeas corpus proceedings of this nature the jurisprudence of our state has consistently recognized the superior right of the natural parent (or parents) to the custody (whether the children be legitimate or illegitimate), unless there is some sound and compelling reason for denying it. Thus, in State ex rel. Martin v. Garza et al., 217 La. 532, 46 So.2d 760, we said: "In such cases the sole question for the court's consideration is whether the parent by his or her conduct has forfeited his or her parental right to the child, for it is the well settled jurisprudence of this state that the courts are not authorized to interfere with a parent's authority over his or her children, except if the court is satisfied that he, or she, will neglect them, or expose them to improper influences, in which case the paramount interest which society has in seeing to it that they be well taken care of and properly brought up would justify the court in making some other disposition of them, Ex parte Lincoln, 128 La. 278, 54 So. 818; State ex rel. Martin et al. v. Talbot et ux., 161 La. 192, 108 So. 411; State ex rel. Bethany v. Corley et ux., 172 La. 266, 134 So. 87, and the burden is on those resisting the parent's right to show his or her disqualification or unfitness to have the custody of the child. State ex rel.
*761 Burleigh v. Savoie, 185 La. 985, 171 So. 98; State ex rel. Perdue v. Carkuff, 182 La. 920, 162 So. 729; Heitkamp v. Ragan, 142 La. 81, 76 So. 247. In the case of Heitkamp v. Ragan, supra, this Court quoted with approval the holding in Hibbette v. Baines, 78 Miss. 695, 29 So. 80, 51 L.R.A. 839, as follows: `And while we are bound also to regard the permanent interests and welfare of the child, it is to be presumed that its interests and welfare will be best promoted by continuing that guardianship which the law has provided until it is made plainly to appear that the father [or mother] is no longer worthy of the trust. The breaking of the ties which bind the father [or mother] and the child can never be justified without the most solid and substantial reasons.' (Brackets ours.) 142 La. at page 84, 76 So. at page 248."
Generally speaking, at the time Mrs. Rothrock became pregnant with the child who is the subject of this litigation she and her husband were the mother and father of six other children. A short time prior to the child's birth they, solely because of their particularly strained although not dire financial circumstances, agreed to permit her adoption. The baby was born on June 9, 1962, about 7:30 in the evening, at a hospital in Port Arthur, Texas. Some two hours later, while Mrs. Rothrock was in a hospital bed, the mother and father executed a notarial act surrendering her for adoption. In such act the names and addresses of the adopting persons were omitted. The following day Mrs. Rothrock, with her husband, left the hospital without having seen the baby.
On June 11, 1962 the respondents removed the child from the hospital and took her to their home in Ferriday, Louisiana. Approximately one and one-half months later they initiated adoption proceedings in Concordia Parish.
Immediately after their having been informed of the adoption suit, through a letter from the curator ad hoc appointed to represent them as absentees, the Rothrocks notified such curator (by a letter) of their desire to regain the child's custody. They then went to Ferriday and, while there, retained their present legal counsel.
Shortly thereafter, on counsel's advice and from Orange, Texas, they wrote the Webbers requesting that the baby be returned to their custody; Mr. Rothrock telephoned the Webber residence and talked with Mrs. Webber to no avail; and they notified the Webbers, through certified mail, of their withdrawal and revocation of the adoption consent previously given. And when it became apparent that the Webbers did not intend to release the child this habeas corpus suit was filed (September 25, 1962some three and one-half months after the surrender).
Specifically, and in more detail, the record discloses the following pertinent facts: While the Rothrocks were living in Beaumont, Texas, in September, 1961, Mrs. Rothrock became pregnant. They then were the mother and father of the mentioned six other children; and about this time Mr. Rothrock was discharged from his job with a pest control company on account of his employer's lack of business. He was unable to obtain other employment, so he attempted to operate a pest control enterprise individually. The venture was not very profitable for, according to Mrs. Rothrock's testimony, "he cleared maybe $200" in the ensuing four months' period.
Meanwhile, Mrs. Rothrock, in order to provide the family necessities, obtained employment as a waitress at a salary of only $35 per week plus "very few" tips. Further, they owned a 1958 automobile on which the payments were $67 per month. Also they were the owners of a house and lot in Beaumont, Texas, purchased late in 1958 at approximately $9,000, for which they were required to make monthly payments of $70.
Sometime in January, 1962 Rothrock obtained employment in Port Arthur, Texas, where he worked for only a short time. Thereafter, he was employed by a pest control *762 firm in Bridge City, Texas. In the latter position he was paid $75 per week until in March or April, 1962 when his salary was increased to $100 per week. In March, 1962 the family leased out the Beaumont house for $75 per month and moved to Orange, Texas, where their monthly rental was $70.
During the period of Rothrock's unemployment and for a number of months thereafter their financial condition was desperate. They had refinanced the automobile, putting up their furniture as collateral security. In June, 1962, when the act of surrender was executed, they still owed $700 or $800 on the car and $7,300 on the house in Beaumont. Unsuccessfully, they attempted to sell the house so as to liquidate their small equity in it; also, they had fallen behind on their car and house payments.
From January, 1962, when Rothrock again became employed, until May they had to meet nine payments on the house, as well as multiple payments on the car. Additionally, there were doctor and hospital bills, brought on by illnesses of some of their six children, and the day to day living expenses. (Incidentally, none of the foregoing facts were rebutted, nor are they now seriously disputed, by respondents.)
About mid-April, 1962 Mrs. Rothrock visited the offices of a Dr. I. T. Young in Port Arthur, Texas (a relatively short distance from her home in the City of Orange), to see if he would attend her delivery. While there she discussed her financial situation with Dr. Young. He told her that he did not pratice obstetrics, and he referred her to Dr. O. J. Richardson of Nederland, Texas (in the Orange-Beaumont-Port Arthur area). At the same time he suggested that she should consider having the child adopted at its birth.
The respondents insist that Mrs. Rothrock went to Dr. Young and told him that she wanted to have the baby adopted. However, she steadfastly denied this (under rigorous cross-examination) and there is no evidence to rebut her testimony. It is true that Dr. Young resides in Texas. But so does Dr. Richardson; and he went personally to Concordia Parish, Louisiana, where the case was tried to testify. Furthermore, it does not appear that any attempt was made to obtain by deposition Dr. Young's testimony to contradict Mrs. Rothrock. Consequently, considering the entirety of Mrs. Rothrock's evidence (even through the rigorous cross-examination) we see no reason not to accept her recitation of what occurred.
The Rothrocks admitted that when the wife visited Dr. Richardson on June 4, 1962 they were considering the possibility of placing the child for adoption, this solely because of their strained financial circumstances and of the necessity of caring properly for their other six children. Also, some months previous to this time Dr. Richardson, who is Mr. Webber's uncle by marriage, had been informed by respondents of their desire to adopt a child and that they would like for him to obtain one for them.
Dr. Richardson did testify that he and Dr. Young had conversed in May, at which time the latter told him of Mrs. Rothrock's visit; that he had referred her to Dr. Richardson; and that she wanted to have the baby adopted. But this last statement is at variance with Mrs. Rothrock's testimony in which she said that she had not told this to Dr. Young but, rather, he had suggested the adoption. In any event it, at least, is hearsay evidence from Dr. Richardson as to exactly what she had told Dr. Young; and it is possible that Dr. Richardson misunderstood Dr. Young's remarks concerning the question of whether she wanted to surrender the baby for adoption.
But be that as it may, Mrs. Rothrock testified emphatically that when she went to see Dr. Richardson on June 4, to request him to attend her at the delivery, she did not ask him about having the baby adopted; that he himself had brought up the subject of adoption. And Dr. Richardson admitted this to be correct.
*763 At the time the baby was to be born at the Park Place Hospital in Port Arthur, Texas (about 20 miles from Orange) on June 9, Dr. Richardson could not be reached and an associate attended Mrs. Rothrock. Some two hours later (about 9:30 p. m.) relators signed the surrender document before an attorney-notary, a Mr. Carriker, who maintained his offices in nearby Nederland, Texas, and who had prepared the instrument and brought it to the hospital for execution at the request of Dr. Richardson's wife. The following morning Mrs. Rothrock left the hospital with her husband.
The Rothrocks testified that almost immediately thereafter they regretted their act, and Mrs. Rothrock said that she then attempted to get in touch with Dr. Richardson by telephone but was unable to do so. Dr. Richardson denied that he was informed of the call and stated that he did not believe it likely that relatrix telephoned his office, although it was possible. The respondents failed, however, to obtain the testimony of Dr. Richardson's office employees to rebut relatrix's evidence.
Mrs. Rothrock further testified that she had also telephoned Mr. Carriker (the attorney-notary) and was informed by him that he could tell her nothing about the whereabouts of the baby. Mr. Carriker, produced to rebut this, denied that he had even spoken with relatrix after his visit to the hospital. However, she regained the stand and testified that she had called Mr. Carriker's office and a man answered; that she had assumed that it was Mr. Carriker; and that the person to whom she spoke at no time informed her otherwise.
Both of the Rothrocks honestly and frankly admitted that they had prearranged with Dr. Richardson for the adoption of their baby by a couple of his selection (unknown to them); that they were aware of the consequences of their voluntarily executed act; and that it purported to permit adoption of the baby by someone, after which they would lose their parental rights. But they stated it was done under emotional and mental stress brought on by their desperate financial condition, they having been faced with the loss of their house, of their car and furniture, as well as with the necessity of properly caring for the new born infant and their other six children; and that they acted in the sincere belief that what they were doing was best for the new baby and for the rest of the family. They conceded that they should not have so acted, and they were extremely remorseful of their conduct.
The efforts of the Rothrocks to locate the child within days after the surrender, their concern and action to regain custody immediately on learning of her whereabouts, and their care, devotion and attention which they have manifested toward the other children through the years, lead us to conclude that they testified truthfully.
Too, the Court of Appeal itself found no reasons why the Rothrocks would not now be morally, emotionally or financially able to have custody of the baby. In this connection the court said: "The evidence also clearly reflects that the natural parents are persons of good moral character and are able to afford the infant a decent home with its six natural brothers and sisters." And, while the moral and financial ability of the Webbers to care for the infant are likewise beyond question, the qualifications of the foster parents are not a determining factor unless and until it has been shown that the natural parents are unfit or that it will be to the welfare of the child to deprive them of their legal rights.
We have closely scrutinized and carefully considered the entire record because, as we have stated on numerous occasions, the responsibility of a decision which concerns the future welfare and life of a child rests exceedingly heavy upon this court. Moreover, in view of the good moral character of the relators, their desire and ability now to care for the child, the very short period of their separation from her, and the baby's tender age (now approximately 19 months old) we can find no good reason (much less *764 a compelling one) why it would be to the best interest and welfare of the child to deprive the natural parents of her custody and to take from her the privilege and advantage of growing up with the love and affection of the natural parents and of the brothers and sisters.
True, there is in the record evidence that possibly, even probably, the child would receive more of the material things from the Webbers, for they, with only this one adopted child to care for, are in a better financial position to furnish those things than are the Rothrocks. On this question, however, we said in State ex rel. Perdue v. Carkuff et al., 182 La. 920, 162 So. 729: "* * * Although it is true that respondents are financially in a better position than relator to care for the boy, who does not know his father because the child has lived with respondents since his birth, nevertheless we do not think that `* * * the fact that other people are attached to the child, or that the child is attached to other people, or that the ability of other people can better provide for the care, etc., of the child deprive the father of his parental right and authority to have the care and custody of his own child." Heitkamp v. Ragan, supra."
The Court of Appeal, in reaching the conclusion that the foster parents should be permitted to keep the child, relied primarily (if not exclusively) on State ex rel. Deason et ux. v. McWilliams et ux., 227 La. 957, 81 So.2d 8. It interpreted that case as holding "* * * broadly that natural parents, who voluntarily and with complete comprehension of their act surrender a child to foster parents with the intention of placing the child permanently with such foster parents to be raised as their own, ordinarily cannot later obtain the return of the child from the foster parents simply because the natural parents later change their mind and now regret having surrendered their child. * * *"
But the Deason case makes no such broad holding. The decision was based on the finding, after a careful review of the evidence, that the welfare of the child would best be served by permitting it to remain with the foster parents, this because a majority of the justices were convinced that the natural parents had never wanted the child (the relatrix there had undergone an operation to render herself sterile which proved unsuccessful), had no reason other than their disinterest for surrendering it ordinarily (they were financially able to keep it), and did not even want it when they filed the custody suit which was done at the insistence of the child's grandmother. And, although fully aware of the whereabouts of the baby and in touch with the foster parents, they did not seek to regain its custody until some six months after its surrender. The court in its opinion specifically recognized that case as being distinguishable from those disputes where the parent or parents surrender the child under the stress of grave illness, financial difficulty or pressing social problems.
If the court in the Deason matter had intended to hold that the mere surrender for adoption deprived the natural parents of their rights it would not so painstakingly have discussed each and every item of evidence which, taken together, convinced it that the welfare of the child necessitated its being left with the foster parents. Had the decision been so broad as supposed by the Court of Appeal in the instant case, the court simply would have disposed of the matter by referral to and relying on the act of surrender.
In connection with this discussion and differentiation of the Deason case, we deem it appropriate to recognize the fact, emphasized by the respondents, that Mr. and Mrs. Rothrock did not inform their parents or any other member of their respective families of the impending birth or that they intended to surrender their child for adoption. Mrs. Rothrock's unrebutted testimony, we think, adequately explained the reason for this. She stated that actually the families did not see each other often, they seldom communicated, and that while both she and her husband had brothers and sisters *765 they were themselves struggling to take care of their own large families which, at the time, were heavily burdened principally because of a number of illnesses.
Further, she explained that Mr. Rothrock's parents were living on a pension or social security and that they had never previously been able to lend assistance or care for any relators' children. Her parents, also with only small means, were at the time helping to take care of the children of another daughter who, in the opinion of her physician, was unable to attend them.
Mrs. Rothrock further testified that in view of such conditions she thought it would cause her parents only additional needless worry if informed of her own problems and circumstances, particularly since nothing could be done about them. Besides, and regardless of the relators' reasons for not telling their families initially, there is no evidence that their attempt to regain custody of their child was motivated in any way by the urgings of a member or members of said families, such as was the situation in the Deason case.
The pertinent facts of the instant case, we think, are more nearly like those in State ex rel. Simpson et al. v. Salter et al., 211 La. 918, 31 So.2d 163. True, the child involved therein was illegitimate; but the law relating to the rights of the parents of legitimate and illegitimate children is the same, although the fact of illegitimacy may sometimes weigh against the natural parent in a consideration of the welfare of the child. See State ex rel. Guinn v. Watson, 210 La. 265, 26 So.2d 740.
In the Simpson case the natural mother and the prospective foster parents corresponded for some time before the child was born, they having sought to arrange matters to facilitate its surrender at birth and to provide for the subsequent adoption. The mother's expenses during this time, and those incurred in the delivery, were paid by the foster parents; and on the day of birth the mother signed a letter purporting to give the child to them. Twelve days later, after consultation with her uncle and on his advice (that due to the child's illegitimacy and her financial condition it would be better to surrender it for adoption), the mother executed an instrument, witnessed by her uncle, consenting to the adoption of the child by the foster parents and waiving the privilege accorded to her by law. Clearly the mother knew that this was to be a permanent surrender if the child was to be adopted. Some eight months later she brought habeas corpus proceedings to regain custody. This court declared that it had "always recognized the paramount right of the parent to its minor child unless it is proven that the parent is unfit to have its custody and control"; it noted that there was nothing in the record to show that the child would not be well cared for in the home of her natural mother who was by then remarried to her former husband and that the case was not one where a child is left in the custody of others for a long period of time before a request is made for its return; and it concluded that, under these circumstances, there was no basis for refusing to recognize the natural and legal right of the mother to her child's custody.
In the Court of Appeal these relators relied heavily (as they do here) on State ex rel. Simpson v. Salter and Martin v. Garza, both supra. That court noted a distinction between those cases and this matter in that in neither of them did the parent intend a permanent surrender. But from the above recitation of the facts of the Simpson case, it is obvious that at least as to that decision the distinction is not a valid one. Perhaps recognizing that the distinction was not altogether appropriate the court further observed that the mentioned cases were "rendered prior to the subsequent development of the jurisprudence relative to the rights of natural parents versus foster parents to whom a child has been voluntarily surrendered as represented by the more recent Supreme Court decisions in State ex rel. Paul et al. v. Peniston et al., 235 La. 579, 105 So.2d 228 and State ex rel. Deason v. McWilliams, supra."
*766 In neither of these cited cases did we intend in any way to modify the legal pronouncements of the Garza and Salter decisions, and in both we recognized the superior right of natural parents to the custody of their children, unless the court should find that for good reasons respecting the welfare of the child they should be denied that right. In the Deason case (as we have noted) it was the parents' lack of love, interest and affection for the baby, and in the Peniston case it was because the child, who was eleven years old when the suit was filed, had been left for so long a time (nine years) with its foster parents, to whom she had become devoted as a real daughter, and who, in turn, had reciprocated with their love and attention. We also noted in the latter case that while the child's wishes were not controlling, they should be considered, and that she had expressed a desire to continue living with her foster parents in the only home she had ever had, she, during that time, having intermittently visited with her real parents for short periods. Thus, in those cases it was the best interest of the child which dictated that we withhold from the natural parents their superior right. It was not withheld merely as a punishment or penalty to the surrendering parent, nor as weighing the right of the natural parent as against the foster parent.
Moreover, if there be any doubt as to whether we intended in any way to weaken the effect of the legal pronouncements in State ex rel. Simpson v. Salter and State ex rel. Martin v. Garza, both supra, such doubt must be immediately dispelled by the fact that in the recent case of State ex rel. Lombardo v. Miller, 232 La. 617, 94 So.2d 888 (decided after the Deason and Peniston cases) we reiterated such principles practically verbatim with emphasis and approval. See also State ex rel. Brode v. Hatcher, 233 La. 636, 97 So.2d 422.
Nowhere in the brief of respondents (or in the opinion of the Court of Appeal) are there any circumstances pointed to (other than the fact that the parents voluntarily executed a notarial act of surrender) which would evidence that the welfare of the child would now be best served by depriving the natural parents of their right to custody. On the other hand, we find from our study of the record that under the facts of this case her interest would best be served by our ordering that the child be returned to them. They are persons of good moral character and have, in the past, bent every effort to rearing properly and well their other children. We are convinced that they are aware of the mistake they made in surrendering her in the first place; they are truly remorseful for their act in so doing; and they are desirous of regaining her custody and of making amends by affording the child their love and affection, together with the companionship of her brothers and sisters.
We are aware of the fact that the child will be approximately 20 to 21 months old on her return to her parents. But the greater part of this time will have been due primarily to legal delays occurring during the course of these proceedings and over which the relators had no control, for they sought to regain custody immediately upon learning of the child's whereabouts and within three months of her birth. We do not believe that their rights to custody should be defeated through the wrongful withholding by the respondents and the delays of the law. If that were so, in every case a natural parent could be deprived of custody merely by a resort to protracted and extensive litigation.
Too, we think that the period of time involved here will not materially affect the welfare of a child so young as the one here. Particularly do we note that in State ex rel. Simpson v. Salter, supra, there had been a sixteen months' separation from the time the child was surrendered until the date of our final judgment. And in State ex rel. Martin v. Garza, supra, the child, which was eight months old when surrendered, was in the custody of its foster parents a year before the mother brought her proceedings, and our judgment ordering its return became *767 final when the child, who was then almost four years old, had been with the foster parents for three years.
Approximately three weeks after the instant case was argued and submitted to this court, and following our preparation of the opinion and decree herein, the respondents filed a motion to remand the cause to permit them to show that the removal of the child from their custody would:
"(a) Cause said child to suffer irreparable harm to her physical and mental condition.
"(b) Precipitate a childhood depression.
"(c) Cause said child to suffer a permanent psychological impairment."
The motion is not well founded. The stated conclusions of the respondents run counter to the well settled jurisprudence that, as expounded in the cases heretofore cited in this opinion, the presumption is that the interest and welfare of the child would best be served when custody is granted to the natural parent (or parents).
Furthermore, in a number of cases the courts have transferred custody of children to their natural parents after longer periods of separation than exists here and when such children were older and more impressionable than is the baby girl who is the subject of this litigation. And no facts have been alleged by respondents in the motion to remand which would warrant a distinction between those cases and the present one.
Unquestionably, when, for legal or other reasons, a change in the actual custody must be effected it should be done as soon as possible and while the child is still of tender age as is the present one. A remand of this cause now can only further retard the transfer.
On a few occasions we have remanded cases of this nature for additional evidence when the record left doubt as to the fitness of the natural parents for the custody or as to their ability to provide a suitable home for the children. State ex rel. Landry v. Robin, 193 La. 789, 192 So. 349; State ex rel. Eastham v. Traylor, et al., 210 La. 1003, 1004, 29 So.2d 43; State ex rel. Brode v. Hatcher, supra; and Dungan v. Dungan, 239 La. 733, 119 So.2d 843. See also State ex rel. Cockerham v. Jordan, supra. But it is not even suggested in the motion to remand that either of those alternatives exists here. Hence it follows that the factual showing made by these respondents (or rather the lack thereof) does not justify our remanding the matter and further protracting the separation of relators from their baby girl which has already endured too long.
For the reasons assigned the judgments of the district court and the Court of Appeal dismissing relators' custody proceedings are reversed and set aside, the motion to remand is denied, and it is now ordered, adjudged and decreed that the respondents, Clyde Ray Webber, Jr. and Gwendolyn Huff Webber, surrender the custody of the minor child, called by them Laura Ann Webber, to her natural mother and father, Ruth Rothrock and Roy Lamar Rothrock, the relators herein. All costs are to be paid by respondents.
HAWTHORNE and SANDERS, JJ., dissent with written reasons.
HAWTHORNE, Justice (dissenting).
It is my view that the natural parents of the child here involved should be denied her custody under the holding of this court in State ex rel. Deason v. McWilliams, 227 La. 957, 81 So.2d 8, and State ex rel. Paul v. Peniston, 235 La. 579, 105 So.2d 228. The Court of Appeal relied on these two cases in denying to the natural parents custody in this case. I am in full accord with the view expressed by that court, see La.App., 155 So.2d 763, and think its judgment should be affirmed.
*768 SANDERS, Justice (dissenting).
The overriding consideration in all decisions respecting custody is the welfare of the child. This is true even when the contest is between the natural parents and others with whom they have placed a child. The superior custodial right of parents must yield if the welfare of a child requires it.
The majority has narrowly, and in my opinion erroneously, restricted the application of this principle in the present case. On motion to remand, the foster parents have urged that available medical information will establish that a change in custody at this time will cause irreparable physical and psychological harm to the child. They seek a remand of the case to produce this evidence. However, even in the absence of such a motion, a remand is always a proper disposition if it will serve the ends of justice. Art. 2164, LSA-C.C.P.
The majority, however, rejects a remand on the ground that the motion does not allege the existence of any evidence reflecting upon the fitness of the natural parents or their ability to provide a home, and runs counter to the presumption that the welfare of the child would best be served in the custody of the natural parents. Thus the Court, in effect, holds that medical evidence of this type is not material in a custody litigation in which the natural parents are parties.
I cannot agree to this holding. In cases such as this, the welfare of the child has a broader meaning than ascribed to it. It is not restricted to the fitness of the natural parents and the suitability of their home. It involves a wide range of factorsenvironmental, physical, and psychological which bear upon the normal development of the child. To omit the child (and its personality) from the judicial inquiry is, in my opinion, a serious defect in the Court's holding. In the interest of justice, I would remand the case for the reception of the additional evidence.
I respectfully dissent.