CHASEZ, Judge.
This is a habeas corpus action in which the relator and relatrix, Mr. and Mrs. Louis J. Chevolleau, are attempting to gain the custody of their child, Lillian Rita Chevolleau, from the respondents Mr. and Mrs. Vincent Catalanotto. The trial court refused to grant custody to the Chevolleaus and ordered that custody be granted to respondents. Mr. and Mrs. Chevolleau have taken this appeal.
Lillian Rita Chevolleau is the lawful issue of the marriage of Louis J. Chevolleau and Anna Tusa Chevolleau. Lillian, born May 14, 1960, is the third child of that marriage. When Lillian was approximately four months old Mrs. Chevolleau suffered a nervous breakdown and the Chev-olleaus found it necessary to place young Lillian in the home of Mrs. Chevolleau’s mother, Mrs. Josephine Tusa. This arrangement did not work out well as Mrs. Tusa was physically unable to bear the strain of caring for an infant, therefore with the Chevolleau’s consent, Lillian was then placed in the home of Mr. and Mrs. Catalanotto. Mrs. Catalanotto and Mrs. Chevolleau are sisters.
When Lillian was approximately 19 months of age, Mrs. Chevolleau had recovered from her nervous condition to the point that she was able to care for her daughter again, and she and her husband asked for the child: The Catalanottos voluntarily returned Lillian to her parents at that time, however the young child apparently was insecure in her new home and cried continuously, refused to eat and refused to sleep. After two days of seeing the child continue in this behavior the Chevolleaus became very concerned for her wellbeing and asked the Catalanottos to take Lillian back again. They did so and she has remained with them to the present time. This suit was filed on June 21, 1967.
The Supreme Court of this State in State ex rel. Rothrock v. Webber, 245 La. 901, 161 So.2d 759, made the following statements regarding the status of the law in this area:
“[1] In habeas corpus proceedings of this nature the jurisprudence of our state has consistently recognized the superior right of the natural parent (or parents) to the custody (whether the children be legitimate or illegitimate), unless there is some sound and compelling reason for denying it. Thus, in State ex rel. Martin v. Garza et al., 217 La. 532, 46 So.2d 760, we said: ‘In such cases the sole question for the court’s consideration is whether the parent by his or her conduct has forfeited his or her parental right to the child, for it is the well settled jurisprudence of this state that the courts are not authorized to interfere with a parent’s authority *664 over his or her children, except if the court is satisfied that he, or she, will neglect them, or expose them to improper influences, in which case the paramount interest which society has in seeing to it that they be well taken care of and properly brought up would justify the court in making some other disposition of them, Ex parte Lincoln, 128 La. 278, 54 So. 818; State ex rel. Martin et al. v. Talbot et ux., 161 La. 192, 108 So. 411; State ex rel. Bethany v. Corley et ux., 172 La. 266, 134 So. 87, and the burden is on those resisting the parent’s right to show his or her disqualification or unfitness to have the custody of the child. State ex rel. Burleigh v. Savoie, 185 La. 985, 171 So. 98; State ex rel. Perdue v. Carkuff, 182 La. 920, 162 So. 729; Heitkamp v. Ragan, 142 La. 81, 76 So. 247. In the case of Heitkamp v. Ragan, supra, this Court quoted with approval the holding in Hibbette v. Baines, 78 Miss. 695, 29 So. 80, 51 L.R.A. 839, as follows: “ ‘And while we are bound also to regard the permanent interests and welfare of the child, it is to be presumed that its interests and welfare will be best promoted by continuing that guardianship which the law has provided until it is made plainly to appear' that the father [or mother] is no longer worthy of the trust. The breaking of the ties which bind the father [or mother] and the child can never be justified without the most solid and substantial reasons.’ ” “(Brackets ours.)” 142 La. at page 84, 76 So. at page 248.’ ”
Respondents on the other hand rely heavily on the case of State ex rel. Paul v. Peniston, 235 La. 579, 105 So.2d 228 (1958), which involves a factual situation similar to the one herein. In that case the natural parents of an 11 year old girl attempted to regain the custody of the child from her paternal aunt and the aunt’s husband, who had been caring for and raising the child for nine years. After reviewing the jurisprudence and quoting at length from the earlier case of State ex rel. Graham v. Garrard, 213 La. 318, 34 So.2d 792, the Court decided that it would be in the best interests of the child to leave it in the custody of her aunt and her aunt’s husband whom she had come to know and love as real parents, and under whose care and guidance she had grown and flourished.
The Peniston case has been the center of much discussion since its rendition. See State ex rel. Hebert v. Knight, 135 So.2d 126, La.App. 1 Cir. 1961; State ex rel. Hampton v. McElroy, 141 So.2d 666, La. App. 1 Cir. 1962; State ex rel. Rothrock v. Webber, supra; 19 L.L.R. 304; 23 L.L.R. 255.
We feel it fair to state that the Peniston case represented a break from the established line of jurisprudence as cited above in State ex rel. Rothrock v. Webber, supra, and as such it should be limited to the peculiar facts in that case. In Peniston we see the following statements which we find represent a real point of distinction beween our case and that one.
“It is maintained by the Pauls that they did not voluntarily permit their child to be reared by the Penistons; that, rather, the latter would not let her come home. As a witness Mr. Paul stated that commencing in 1951 he regularly asked his sister to return Shirley Rae but that she kept ‘putting him off’, saying that she wanted the child for company. The Penistons dispute this statement, they testifying that no such request was made until the summer of 1957, shortly before the filing of this suit.
“With regard to such conflict in the testimony the trial judge said: ‘* * * I believe that even if such requests were made by the relators they were in such a casual way as not to be considered serious by the Penistons. The testimony of the relators themselves indicates the casual and insincere manner in which the requests were made, if at all. The actions of the relators speak even louder than their words, because from 1950, aft *665 er Mrs. Paul returned from the hospital until the summer of 1957 the Pauls did not take any positive action to regain the custody of Shirley Rae, although they were physically and financially able to take care of her. They did not insist that the Penistons return Shirley Rae to Simmesport and, of course, the Courts were open to relators during all this time to enforce their rights as parents.’
“These observations are amply.supported by the record. And we might add that if the Pauls were desirous of having Shirley Rae live with them, as they would now have the court believe, they could have refused to return her to the Penistons at the conclusion of any one of her several summer vacations visits in Simmesport. Besides, it is to be noticed that after Mrs. Paul became physically able to care for Shirley Rae the real parents exerted little special effort to see her. Most of their contacts with the child occurred only when the Penistons brought her to Simmesport or when the Pauls were in Alexandria on business missions.”
In the case at bar we find nothing in the record which would indicate to us that Mr. and Mrs. Chevolleau were not at all times desirous of having their child returned to them. On one occasion, when Lillian was about five years of age, Mrs. Chevolleau went so far as to go to the Catalanotto’s house to physically take her daughter home with her only to be stopped by the entreaties of her sister and her mother. If the Chevolleaus were guilty of any acts of omission it was in allowing Mrs. Chevol-leau’s mother, Mrs. Tusa, to continually convince them that an opportune moment had not arrived for the return of their child to them in the misguided belief that they were doing what was best for the child at the time.
On the other hand we find that the Ca-talanottos themselves were not free from fault in creating a situation where the child was prevented from realizing the care and love of its natural parents. Mr. and Mrs. Catalanotto admitted that they did not attempt to explain to young Lillian that they were not her real parents until the child was five years of age. They admitted they did not actively encourage the young child to visit her parents or know them better or do anything which would ease the eventual period of adjustment when the child would return to her real parents.
On the other hand Mr. Catalanotto stated that shortly after the Chevolleaus returned Lillian to him, when she was 19 months old, he talked to a judge who correctly advised him that an adoption was impossible without the Chevolleau’s consent. At that time he decided “* * * j began to believe after talking with them that the proper thing to do was to hold Lillian in my custody and let them take action against us and * * * at all times I’ve always told my daughters that, don’t do anything, don’t let Lillian get out of your sight as far as letting anyone take her against your will unless I told them to do so.”
The record is replete with statements by Mr. and Mrs. Catalanotto that they were desirous of adopting young Lillian from the time they took her back when she was nineteen months old. Although the Cata-lanottos testified they agreed to care for her again only with the understanding that such an adoption would be possible, an understanding which apparently was unilateral on this part, they knew in fact that Mrs. Chevolleau at least would never agree to such an action. It was this knowledge which persuaded them to do nothing to encourage the young child to want to return to her natural parents, and which lead Mr. Catalanotto to follow the course of action which is reflected in his above quoted statement.
Thus while in many respects the case before us is similar to the Peniston case, supra, clearly there are important areas which distinguish the two on a factual ba *666 sis, and therefore we are not compelled to follow the Peniston decision herein. Indeed if there is any uncertainty as to the effect State ex rel. Peniston v. Paul, supra, had on the prior jurisprudence this uncertainty was rectified by the Supreme Court in State ex rel. Rothrock v. Webber, supra, when it stated in these words:
“Moreover, if there be any doubt as to whether we intended in any way to weaken the effect of the legal pronouncements in State ex rel. Simpson v. Salter [211 La. 918, 31 So.2d 163] and State ex rel. Martin v. Garza, both supra, such doubt must be immediately dispelled by the fact that in the recent case of State ex rel. Lombardo v. Miller, 232 La. 617, 94 So.2d 888 (decided after the Deason [State ex rel. Deason v. McWilliams, 227 La. 957, 81 So.2d 8] and Peniston cases) we reiterated such principles practically verbatim with emphasis and approval. See also State ex rel. Brode v. Hatcher, 233 La. 636, 97 So.2d 422.”
The trial judge in his reasons for judgment found as a fact that both the Chevol-leaus and Catalanottos enjoy good reputations in their respective circle of friends and each is fit and able to properly care for the child. He stated: “In fact, there is not even a suggestion on the part of the Chevolleaus or the Catalanottos that their opponents are unfit for having custody or that the home of either would not be conducive to the child’s welfare.”
He went on to find however that the best interests of the child would be to allow it to remain with the Catalanottos with whom she had been living for almost seven years. We cannot agree with this last conclusion as there admittedly is nothing in the record which would indicate that the Chevolleaus would act in any other manner than as good and devoted parents, and as they are and have been willing and anxious to have their child live with them again we find the best interests of young Lillian would be served by having her return home to her natural parents.
For the reasons herein assigned the judgment of the District Court in favor of respondents Mrs. Jackie Tusa, wife of Vincent Catalanotto and Vincent Catala-notto and against relators, Mrs. Anna Tusa, wife of Louis j. Chevolleau and Louis J. Chevolleau is reversed and set aside; and it is now Ordered, Adjudged and Decreed that the Writ of Habeas Corpus issued herein by the 25th Judicial District Court for the Parish of St. Bernard is maintained and that accordingly, It is Ordered, Adjudged and Decreed that there be judgment in favor of relators, Mrs. Anna Tusa, wife of Louis J. Chevolleau and Louis J. Chevolleau and against the respondents Jackie Tusa, wife of Vincent Catalanotto and Vincent Catalanotto, commanding said respondents to release and surrender the minor child Lillian Rita Chevolleau to her natural father and mother, Mrs. Anna Tusa, wife of Louis J. Chevolleau and Mr. Louis J. Chevolleau, the relatrix and relator herein. All costs are to be paid by respondents.
Reversed and rendered.